1996 SD 55

**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Charles Russell RHINES, Defendant
and Appellant.**

No. 18268.

Supreme Court of South Dakota.

Argued Oct. 18, 1995.

Decided May 15, 1996.

Rehearing Denied June 28, 1996.

Mark Barnett, Attorney General, Grant Gormley, Craig M. Eichstadt, and Sherri Sundem Wald, and Gary Campbell, Assistant Attorneys. General, Pierre, for plaintiff and appellee.

Michael Stonefield, Pennington County Public Defender's Office, Joseph M. Butler of Bangs, McCullen, Butler, Foye & Simmons, and Wayne F. Gilbert of Johnson Huffman, Rapid City, for defendant and appellant.

MILLER, Chief Justice.

[¶ 1] From the latter part of 1991 through February 1992, Charles Russell Rhines worked at the Dig 'Em Donut Shop on West Main Street in Rapid City, South Dakota. In February 1992 Rhines was terminated from this job.

[¶ 2] On March 8, 1992, the body of Donnivan Schaeffer, an employee of Dig 'Em Donuts, was found in the storeroom of the donut shop on West Main Street. Schaeffer's hands were bound, and he had been repeatedly stabbed. Approximately $3,300 in cash, coins, and checks was missing from the store. Additional facts will be recited herein as they relate to specific issues.

[¶ 3] The State charged Rhines with third-degree burglary of the store and first-degree murder of Schaeffer. A jury convicted him of these crimes. The jury recommended a sentence of death for the first-degree murder conviction. The trial court entered a judgment and warrant of execution. Rhines appeals. We affirm.

ISSUE 1.

[¶ 4] **Did the trial court err by not suppressing incriminating statements made by Rhines to law enforcement officers on June 19 and 21, 1992?**

[¶ 5] At approximately 12:45 p.m. on June 19, 1992, Rhines was arrested in King County, Washington, for a burglary that occurred in that state. King County Police Officer Michael Caldwell read Rhines the following *Miranda* warning:

> You have the right to remain silent. Number 2, anything you say or sign can be used as evidence against you in a court of law. Number 3, you have the right at this time to an attorney of your own choosing, and to have him present before saying or signing anything. Number 4, if you cannot afford an attorney, you are entitled to have an attorney appointed for you without cost to you and to have him present before saying and signing anything. Number 5, you have the right to exercise any of the above rights at any time before saying or signing anything. Do you understand each of these rights that I have explained to you?

According to Officer Caldwell, Rhines responded by asking something to the effect, "Those two detectives from South Dakota are here, aren't they?" Caldwell made no reply. Caldwell did not attempt to question Rhines, and Rhines made no further statements to Caldwell. Rhines was placed in a holding cell at a King County police station.

[¶ 6] At 6:56 p.m. that same day, two South Dakota law enforcement officers, Detective Steve Allender of the Rapid City Police Department and Pennington County Deputy Sheriff Don Bahr, interrogated Rhines about the burglary of Dig 'Em Donuts and the murder of Schaeffer. Detective Allender testified that he advised Rhines of his *Miranda* rights prior to questioning him. The exchange between himself and Rhines is as follows:

> Allender: You have the continuing right to remain silent. Do you understand that?
>
> Rhines: Yes.

Allender: Anything you say can be used as evidence against you. Do you understand that?

Rhines: Yes.

Allender: You have the right to consult with and have the presence of an attorney, and if you cannot afford an attorney, an attorney can be appointed for you free of charge. Do you understand that?

Rhines: Yes.

Allender: Having those rights in mind, are you willing to answer questions?

Rhines: Do I have a choice?

Allender testified he told Rhines he did have a choice and in fact Rhines did not have to talk with them at all. Allender then asked if Rhines wanted to talk with them and Rhines said, "I suppose so," and then said, "I'll answer any questions I like." Shortly thereafter, Rhines confessed to the burglary of Dig 'Em Donuts and to the killing of Schaeffer.

[¶ 7] Approximately two hours later, Rhines gave the officers permission to tape record his statements. The following exchange occurred:

Allender: Ok. Um, do you remember me reading you your rights?

Rhines: Yes.

Allender: In the beginning? Did you understand those rights?

Rhines: Yes.

Allender: And uh, having those rights in mind you talked to us here?

Rhines: Yes I have.

During the taped portion of the interview, Rhines again made incriminating statements about the burglary of Dig 'Em Donuts and the killing of Schaeffer.

[¶ 8] On June 21, 1992, Detective Allender and Deputy Sheriff Bahr posed additional questions to Rhines. This interview was tape recorded. Prior to questioning, Detective Allender had the following conversation with Rhines:

Allender: You have the continuing right to remain silent, do you understand that?

Rhines: Yes.

Allender: Anything you say can be used as evidence against you. Do you understand that?

Rhines: Yes.

Allender: You have the right to consult with and have the presence of an attorney, and if you cannot afford an attorney, an attorney can be appointed for you free of charge. Do you understand that?

Rhines: Yes.

Allender: K. Just like the other night, having these rights in mind, are you willing to answer questions?

Rhines: Yes.

Allender: Ok. And that, in this case, it goes, if you don't like the question, it doesn't mean that you're supposed to answer it. You can always say stop, ok?

Rhines: I can take the 5th Amendment.

Allender: Exactly.

Rhines proceeded to make incriminating statements about the burglary of Dig 'Em Donuts and the death of Schaeffer.

[¶ 9] Rhines filed a pretrial motion to suppress the incriminating statements made to the officers on June 19 and 21, 1992. After a hearing, the trial court denied this motion. At trial, Detective Allender testified regarding Rhines' statements during the untaped portion of the June 19, 1992, interview. Rhines entered a continuing objection to this testimony. Over Rhines' objection, the trial court also permitted the State to play the recordings of the interviews that took place on June 19 and 21, 1992. Rhines claims the trial court erred in admitting his statements.

[¶ 10] Rhines argues the trial court erred in failing to suppress the incriminating statements he made during the June 19 and 21 interviews. He claims that the *Miranda* warnings recited to him were deficient for several reasons. He also asserts that he never gave a valid waiver of his *Miranda* rights. We will consider each of his contentions in turn.

[¶ 11] Preliminarily, we reiterate that the Fifth Amendment to the United States Constitution provides in part:

No person ... shall be compelled in any criminal case to be a witness against himself[.]

U.S. Const.Amend. V.[1] The Fifth Amendment privilege against self-incrimination is implicated whenever an individual is subjected to a custodial interrogation by the police. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). To protect the privilege, law enforcement personnel must observe certain procedural safeguards. 384 U.S. at 478–79, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. In the absence of other equivalent procedures, law enforcement must advise a suspect as follows:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. If the individual indicates at any time before or during questioning that he wishes to remain silent or that he wants an attorney, the interrogation must end. 384 U.S. at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723. If law enforcement fails to follow these or other equivalent procedures, the prosecution may not use statements made during a custodial interrogation as proof of guilt. 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

■ [¶ 12] Importantly, *Miranda* does not require that warnings be given in the exact form described in that decision. *Duckworth v. Eagan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166, 176 (1989). "[T]he words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective. Words which convey the substance of the warning along with the required information are suffi-

cient." *Evans v. Swenson*, 455 F.2d 291, 295 (8th Cir.1972), *cert. denied*, 408 U.S. 929, 92 S.Ct. 2508, 33 L.Ed.2d 342 (1972) (citations omitted).

### [¶ 13] 1. The right to terminate questioning.

[¶ 14] Rhines contends Detective Allender's warnings on June 19 and June 21, 1992, failed to advise him of his right to terminate questioning at any time. Rhines further argues that Officer Caldwell's earlier recitation, which includes such a warning, cannot be combined with Detective Allender's advisement to arrive at a sufficient warning. Rhines reasons that, since he never told Caldwell he understood the rights that Caldwell recited to him, the State failed to show that Rhines understood his right to terminate questioning.

[¶ 15] *Rhines points to State v. Brings Plenty*, 459 N.W.2d 390 (S.D.1990), as support for his claim that the "continuing right to remain silent" warning was insufficient. In *Brings Plenty*, the trial court ruled that statements by the defendant which were coerced and involuntary could be used to impeach the defendant, should he testify. *Id.* at 394. On appeal, we reversed and granted the defendant a new trial on the grounds that involuntary statements are inadmissible for any purpose. *Id.* at 397.

[¶ 16] In dicta, we criticized a warning that was essentially identical to the warning given to Rhines.[2] We reasoned the advisement was deficient under *Miranda*, because it failed to inform the defendant of his right to terminate questioning at any time. *Id.* at 395–96.

■ [¶ 17] Rhines' reliance on *Brings Plenty* is misplaced. First, the discussion of the warning in *Brings Plenty* is not binding precedent. Second, Detective Allender's statement that Rhines had a "continuing right to remain silent" adequately advised

---

1. Article VI, § 9, of the South Dakota Constitution states in relevant part: "No person shall be compelled in any criminal case to give evidence against himself[.]"

2. According to the briefs in *Brings Plenty*, the officer advised defendant as follows:

> Ok, you have the continuing right to remain silent. Anything you say can be used as evidence against you. You have the right to consult with and the presence of an attorney. If you cannot afford an attorney, an attorney will be appointed to you. Do you understand these rights ... ?

him of his option to terminate questioning at any time. Additional warnings given to Rhines on June 19 and 21 reinforced this advisement. When Rhines was first arrested on June 19, 1992, Officer Caldwell told him, "You have the right to remain silent. . . . [Y]ou have the right to exercise any of the above rights at any time before saying or signing anything." There was no intervening interrogation of Rhines between his arrest and questioning by Allender and Bahr that might blunt the effect of this warning.

■ [¶ 18] Rhines counters that his June 19 confession must be suppressed, because there was no showing that he understood the warnings given by Caldwell and Allender concerning the right to terminate questioning. We reject Rhines' assertion. There is ample evidence in the record indicating that Rhines had a complete understanding of his right to stop the questioning at any time. Before making any incriminating statements on June 19, Rhines specifically told Allender he would only answer the questions he liked. When the officers questioned him about a topic he did not wish to discuss, he would shut off the tape recorder or tell them to "be quiet." (For example, during the June 19, 1992 interview, Rhines turned off the recorder when the officers began to discuss whether he had been coerced into making a statement. He then explained his personal feelings toward a young man he knew and asked the officers not to dwell on the young man's involvement in the burglary of the donut shop. The officers agreed to that.)

[¶ 19] Excerpts from the taped interview of June 19, clearly show Rhines understood his right to terminate questioning as explained by Officer Caldwell. Law enforcement adequately advised Rhines of his *Miranda* rights prior to the interview on June 19. The trial court did not abuse its discretion in admitting the statements made by Rhines on that date.

■ [¶ 20] On June 21, 1992, the only advisement Rhines received was from Detective Allender. (*See* ¶ 8 supra). Allender's advisement at that time that Rhines need not answer questions he did not like and that he "can always say stop" adequately warned Rhines of his right to terminate questioning at any time. A *Miranda* warning need not be elegantly phrased or mechanically recited. *United States v. Noa,* 443 F.2d 144, 146 (9th Cir.1971) (citing *Camacho v. United States,* 407 F.2d 39, 42 n. 2 (9th Cir.1969)). The purpose of the *Miranda* warning is to explain an aspect of constitutional law to a criminal suspect, so that he can make a voluntary, knowing and intelligent decision whether to talk to the police. Allender's straightforward statements and conversational tone are an acceptable method of advising an individual of his constitutional right to be silent in the face of police interrogation. Furthermore, Rhines' response that he "can take the 5th Amendment" demonstrates that he amply understood his privilege against self-incrimination.

### [¶ 21] 2. The right to an attorney during questioning.

[¶ 22] On June 19 and 21, 1992, Allender advised Rhines: "You have the right to consult with and have the presence of an attorney[.]" Rhines alleges this warning was deficient, because it did not explain the right to have an attorney present *during questioning* or the continuing right to request the presence of an attorney *at any point during questioning.* He contends his inculpatory statements to police should have been suppressed due to these deficiencies.

[¶ 23] This Court has held that the statement, "You have the right to consult with and the presence of an attorney," satisfied the requirement that the suspect be advised of the right to have an attorney present *prior* to any questioning. *Brings Plenty,* 459 N.W.2d at 395. *Accord State v. Croucher,* 326 N.W.2d 98, 98–99 (S.D.1982). We must now consider whether an essentially identical warning adequately communicates the right to have an attorney present *during* questioning.

■ [¶ 24] Rhines was told at the beginning of each interview that he had the right to the presence of an attorney. Because this warning was delivered at the start of each questioning session, it plainly communicated the right to have an attorney present at that time. *Evans,* 455 F.2d at 295–96; *Sweeney*

v. *United States*, 408 F.2d 121, 124 (9th Cir.1969); *People v. Johnson*, 90 Mich.App. 415, 282 N.W.2d 340, 342 (1979). We therefore find no *Miranda* violation.

### [¶ 25] 3. The right to appointment of an attorney.

[¶ 26] On June 19 and 21, 1992, Allender informed Rhines, "if you cannot afford an attorney an attorney can be appointed for you free of charge." According to Rhines, Detective Allender's statement that an attorney "can" be appointed is ambiguous and legally insufficient. He argues that *Miranda* requires he be advised an attorney *would* or *must* be appointed if he cannot afford to hire one.

[¶ 27] At the heart of the *Miranda* opinion is the "concern that the indigent accused in police custody be informed that he has just as much right to representation by an attorney as a person who can afford one." *Mayfield v. State*, 293 Ark. 216, 736 S.W.2d 12, 14–15 (1987), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988). The *Miranda* Court wrote:

> In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent— the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present.

384 U.S. at 473, 86 S.Ct. at 1627, 16 L.Ed.2d at 723. *Miranda* therefore mandated that a suspect be advised "if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

[¶ 28] Although the warning need not contain the exact language used in the *Miranda* opinion, it must effectively communicate the right to appointed counsel if the accused cannot afford to hire a lawyer. *Mayfield*, 736 S.W.2d at 15. In determining whether a particular warning adequately conveys this right, a reviewing court must look to the warnings as a whole rather than focusing on one sentence in isolation. *United States v. Miguel*, 952 F.2d 285, 288 (9th Cir.1991) (citing *Duckworth*, 492 U.S. at 205, 109 S.Ct. at 2881, 106 L.Ed.2d at 178).

[¶ 29] In advancing his argument that Allender's warnings were deficient, *Rhines relies on United States v. Connell*, 869 F.2d 1349 (9th Cir.1989). In *Connell*, the Ninth Circuit Court of Appeals suppressed incriminating statements made by a defendant after he had been given a flawed advisement concerning the right to appointed counsel. *Id.* at 1353. We believe the facts in *Connell* to be clearly distinguishable.

[¶ 30] In contrast to the defendant in *Connell*, Rhines was never told he would have to make his own arrangements for an attorney or that the government would not pay for his attorney. Nor was his right to appointed counsel contingent on a nebulous reference to the requirements of the law. Allender expressly informed Rhines of his right to remain silent, to consult with an attorney, and to have an attorney present. In this context, Rhines was also told that an attorney "can" be appointed if Rhines could not otherwise afford one. There was no additional information to mislead him into believing that an attorney would not be appointed if he could not pay for one.

[¶ 31] Based on the totality of the warning given to Rhines, we conclude the advisement reasonably conveyed the right to appointed counsel. *See also Duckworth*, 492 U.S. at 200–01, 109 S.Ct. at 2879, 106 L.Ed.2d at 175–76; *Miguel*, 952 F.2d at 287–88; *Tasby v. United States*, 451 F.2d 394, 398–99 (8th Cir.1971), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972); *State v. Blanford*, 306 N.W.2d 93, 95–96 (Iowa 1981); State v. Strain, 779 P.2d 221, 223–24 (Utah 1989).

**[¶ 32] 4. Waiver of Miranda rights.**

[¶ 33] Rhines contends he was never told that, by agreeing to answer questions, he would be waiving the rights which had just been recited to him. Nor, he argues, was he specifically asked whether he was willing to waive these rights. He was simply asked, "Having these rights in mind, are you willing to answer questions?" Rhines contends this was an inadequate explanation of his option to waive *Miranda* rights and prevented him from giving a valid waiver. We disagree. An advisement need not specifically refer to a "waiver" of rights in order to be valid.

" '*Miranda* is not a ritual of words to be recited by rote according to didactic niceties. What *Miranda* does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights.' "

*Blanford*, 306 N.W.2d at 96 (quoting *Coyote v. United States*, 380 F.2d 305, 308 (10th Cir.1967), *cert. denied*, 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967)).

[¶ 34] Having determined that the warning was adequate, we must now consider whether Rhines gave a valid waiver of his rights. When the State offers an incriminating statement allegedly made by the defendant, the State has the burden of proving beyond a reasonable doubt that the statement was given knowingly, intelligently, and voluntarily. *State v. Volk*, 331 N.W.2d 67, 70 (S.D.1983). In determining whether a defendant has given a valid waiver of his *Miranda* rights, we look to the totality of the circumstances, " 'including the background, experience, and conduct of the accused.' " *State v. Braddock*, 452 N.W.2d 785, 788 (S.D. 1990) (quoting *State v. West*, 344 N.W.2d 502, 504 (S.D.1984)). The trial court's finding that the defendant's rights had been waived and his statements were voluntary must be upheld unless it is clearly erroneous. *Braddock*, 452 N.W.2d at 788 (citations omitted).

[¶ 35] A waiver of *Miranda* rights need not be express, but "may be inferred from the defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney." *United States v. Betts*, 16 F.3d 748, 763 (7th Cir.1994) (citing *Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2d 197, 212 (1979); *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979)).

[¶ 36] Rhines' conduct shows a valid waiver. When asked whether he understood his rights, Rhines responded that he did. He then answered affirmatively when asked if he was willing to answer questions. He was articulate and detailed in making his statements. There is no indication that Rhines was under the influence of drugs or alcohol or that he was otherwise impaired in his functioning. Nor is there any showing that law enforcement officers unlawfully induced or coerced Rhines to make a confession. Additionally, Rhines clearly understood the consequences of relinquishing his rights, including the fact that his statements could be used against him in court. Referring to his reasons for confessing to the murder, Rhines remarked, "This will come out in court again." At another point in the questioning, Rhines told Allender and Bahr, "If you guys bring some of this stuff into court, you're gonna look really foolish[.]" When Allender reminded Rhines that "this isn't court," Rhines replied, "No. But it will be." Rhines also boldly professed to have knowledge of the statutory and case law.

[¶ 37] Rhines' gratuitous statements reflect an individual who is aware of the potentially grave legal consequences of his confession. The trial court was not clearly erroneous in concluding that Rhines made a knowing and voluntary decision to relinquish his *Miranda* rights.

**ISSUE 2.**

[¶ 38] **Did the trial court err in excusing a prospective juror for cause?**

[¶ 39] As part of the jury selection process, the defense and prosecution thoroughly questioned prospective jurors. When Diane

Staeffler was called for questioning, defense counsel explained the two-step process for determining guilt and setting a sentence in a capital case. After extensive questioning by the defense, the State, and the trial court regarding whether Staeffler could consider imposing the death penalty on a defendant, the trial court denied the State's challenge for cause. The court then permitted the State to resume questioning Staeffler regarding capital punishment, followed by additional inquiries on the subject by the defense and the court. After this additional questioning, the court excused Staeffler from jury duty for cause.

[¶ 40] Rhines challenges the trial court's ruling on two grounds. First, Rhines contends it was error for the court to permit the State to continue questioning Staeffler about her feelings on the death penalty after the trial court had already allowed such questioning and had denied the State's challenge for cause. According to Rhines, State's ensuing questions were leading and argumentative and unfairly caused Staeffler to express an unwillingness to consider the death penalty. Second, Rhines contends the trial court's subsequent decision to excuse Staeffler for cause was a violation of the rule set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He argues that *Witherspoon* requires that the trial court discharge for cause only those who make it unmistakably clear they cannot and will not follow the court's instructions with respect to the death penalty. He claims the elimination of a qualified juror from the panel in violation of *Witherspoon* invalidates the death sentence imposed on him.

[¶ 41] Both the United States and South Dakota Constitutions guarantee trial by an impartial jury. *State v. Hansen*, 407 N.W.2d 217, 220 (S.D.1987) (citing U.S.Const. Amend. VI; S.D.Const. Art. VI, § 7; SDCL 23A–16–3); *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492, 502 (1992) (holding the Sixth and Fourteenth Amendments to the United States Constitution require "the impartiality of any jury that will undertake capital sentencing"). Jury selection is an important means of ensuring this right. The voir dire process is designed to eliminate persons from the venire who demonstrate they cannot be fair to either side of the case. *Morgan*, 504 U.S. at 734 n. 7, 112 S.Ct. at 2232 n. 7, 119 L.Ed.2d at 506 n. 7 (citing *Smith v. Balkcom*, 660 F.2d 573, 578 (5th Cir.1981), *modified*, 671 F.2d 858 (5th Cir.1982), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982)).

[¶ 42] In *Witherspoon*, the Court held: "[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777, 20 L.Ed.2d at 784–85. The Court reasoned that executing a death sentence returned by such a jury deprives the defendant of his life without due process of law and infringes his right to trial by an impartial jury under the Sixth and Fourteenth Amendments. 391 U.S. at 518, 88 S.Ct. at 1775, 20 L.Ed.2d at 783. The Court observed:

> [T]he decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death.

391 U.S. at 521–22 n. 20, 88 S.Ct. at 1776–77 n. 20, 20 L.Ed.2d at 784–85 n. 20.

[¶ 43] The Court suggested that the State could legitimately exclude "those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death." 391 U.S. at 520, 88 S.Ct. at 1776, 20 L.Ed.2d at 784. However, when the State swept from the jury those who simply expressed conscientious or religious scruples against capital punishment or who opposed it in principle, it crossed a constitutional line. 391 U.S. at 520–21, 88 S.Ct. at 1776, 20 L.Ed.2d at 784.

[¶ 44] The United States Supreme Court has since held that the improper exclusion of even one potential juror with general objections to capital punishment requires reversal of the death penalty. *Davis v. Georgia*, 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339, 341 (1976); *see also Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) (plurality opinion). In determining whether a prospective juror may be excluded for cause, the Court applies the following

standard: Would the individual's views "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985). With these principles in mind, we now consider Rhines' contentions.

### [¶ 45] 1. Continued questioning of Staeffler.

■■■ [¶ 46] Rhines contends the trial court improperly permitted the State to resume questioning Staeffler after initially denying a challenge for cause. We disagree. The "latitude allowed to counsel in voir dire of prospective jurors rests largely in the trial court's discretion." *State v. Miller,* 429 N.W.2d 26, 38 (S.D.1988) (citing *State v. Muetze,* 368 N.W.2d 575, 584 (S.D.1985)). Before the court denied the challenge for cause, the State expressly reserved the opportunity to continue questioning Staeffler "depending on the Court's ruling." The court then proceeded to question Staeffler about her ability to decide the case. First, the court asked Staeffler if she could fulfill a juror's oath to be fair and impartial and to follow the law. Staeffler responded affirmatively. Second, the court asked if Staeffler could "consider all the law and options that the law allows." Staeffler agreed that she could. The court then denied the challenge. However, Staeffler's response to subsequent questions from the State demonstrates that she was confused by the court's questions and that additional clarification was necessary. Although Staeffler told the court she could follow its instructions, she immediately indicated to the State that she was not aware this would include consideration of the death penalty.

> State: Ma'am, the Judge just asked you whether you could consider all the options.
> Staeffler: Is that the death penalty?
> State: That includes the death penalty?
> Staeffler: Well—I don't know.

[¶ 47] The defense then interjected its objection to further questioning of Staeffler about capital punishment. However, it had just become apparent that Staeffler's promises to follow the law did not take into account her reservations about the death penal-

ty. In response to subsequent questions by the State, Staeffler's misunderstanding of the court's questions became even more apparent:

> State: What I have been asking you about is whether or not you can fairly consider it as the Judge asked you in terms of having both options, including imposing death upon this man, Mr. Rhines, and what I need to clear up is, when you answered Judge Konenkamp, did you understand what he was asking you?
> Staeffler: Apparently not the first time about considering both options.

[¶ 48] Because Staeffler had not understood the court's questions, her ability to impartially follow the court's instructions was still undetermined. We cannot fault the court for allowing additional inquiries regarding her ability to serve. As the United States Supreme Court observed:

> Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (White, J., plurality opinion). Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471–72, 75 L.Ed. 1054 (1931).

*Morgan,* 504 U.S. at 729–30, 112 S.Ct. at 2230, 119 L.Ed.2d at 503. In light of her misunderstanding of the court's inquiries, we find no abuse of discretion in giving the State the opportunity to clarify Staeffler's answers.

■■■ [¶ 49] Nor do we agree with Rhines' claim that the State's questions were misleading or argumentative. We can detect no material difference between the questioning by the State or by defense counsel. Both the State and the defense questioned Staeffler at length about her position on the death penalty. Both used leading questions during their examination. Indeed, Staeffler's uncertainty and vacillation necessitated lengthy, detailed inquiries and the use of leading questions.

Her apparent contradictions concerning her ability to follow the court's instructions had to be explored by counsel for both sides. The defense even seemed to acknowledge the usefulness of leading questions in ascertaining Staeffler's views. At one point, defense counsel said to Staeffler, "I know I probably have been putting words in your mouth or trying to, but I don't intend to, but I'm trying to get at where you are really at on this death penalty." Later, defense counsel stated to Staeffler, "[The State's counsel is] trying to lead you down a road and I'm trying to lead you down a road, but here's what we need, we need jurors who come into this case and even though you have very strong reservations about the death penalty, we need jurors like you as well[.]" Staeffler's answers during *voir dire* appear to genuinely reflect her personal objections to capital punishment and her unwillingness to participate in the process of imposing a penalty of death. In light of similar questioning by the State and the defense, we cannot conclude that Staeffler's responses were the product of intimidation or confusion caused by the State.

[¶ 50] **2. Disqualification of Staeffler.**

[¶ 51] Rhines claims the trial court improperly excused Staeffler for cause. Rhines asserts the trial court "can only exclude those who have *unequivocally* and *without contradiction* expressed a complete inability to impose the death penalty." (Emphasis in original.) The law does not demand such precision. In *Wainwright*, the Court held that a juror's bias need not be proved with "unmistakable clarity." The Court explained:

> [D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity

in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Wainwright*, 469 U.S. at 424–26, 105 S.Ct. at 852–53, 83 L.Ed.2d at 852–53.

[¶ 52] In accordance with the Court's reasoning, our state law vests a trial judge with broad discretion in determining juror qualifications. *Hansen*, 407 N.W.2d at 220 (citing *State v. Flack*, 77 S.D. 176, 180, 89 N.W.2d 30, 32 (1958)). "The ruling of the trial court will not be disturbed, except in the absence of any evidence to support it[.]" *Flack*, 77 S.D. at 181, 89 N.W.2d at 32. "When the evidence of each juror is contradictory in itself, and is subject to more than one construction, a finding by the trial court either way upon the challenge is conclusive on appeal." *Id.* at 181, 89 N.W.2d at 32.

[¶ 53] To support his claim of error, Rhines notes Staeffler responded affirmatively when the court asked if she could follow the law. However, as noted above, Staeffler misunderstood the court's query and did not realize that following the law included consideration of the death penalty. Furthermore, the impartiality of a juror "must be based upon the whole voir dire examination and single isolated responses are not determinative." *First Bank of South Dakota v. Voneye*, 425 N.W.2d 630, 633 (S.D. 1988) (citing *Hansen*, 407 N.W.2d at 220; *Flack*, 77 S.D. at 181, 89 N.W.2d at 32). Although Staeffler said at various times during voir dire that she could consider a death sentence during penalty deliberations, she also stated that she could *not* consider capital punishment under any circumstances. She made still other statements indicating that, while she might be able to consider capital punishment, she could not be fair and impartial. Staeffler said she did not like the death penalty and "would rather not" sit on a jury in a capital case. She said she did not know if she could sleep at night if she voted to impose the death penalty. When asked if she could be part of a jury that sentenced a

defendant to death, Staeffler said, "Probably not" and "I don't think I could really do it." Even when defense counsel described murders that Staeffler described as "just awful," she responded, "I still don't want to make the [death penalty] decision." Upon additional questioning by the State, Staeffler said she thought capital punishment was appropriate at times but noted she was not the one making the penalty decision. Although she said that imposition of the death penalty would depend on the circumstances, she also stated that she could not imagine any circumstances where she could impose a death sentence. If selected for jury duty, she stated she would be leaning toward imposing a life sentence as opposed to the death penalty. When asked by the trial court if she would fairly consider both options, she stated, "No, I guess not." She later said, "I could consider [the death penalty], but I don't want to. I wouldn't want to make the decision for death." She then reiterated that she could not give fair consideration to both options of life imprisonment and the death penalty.

[¶ 54] Based on a complete review of Staeffler's testimony, we conclude that her views on the death penalty would "prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–52. The trial court did not abuse its discretion in excusing her for cause.

### ISSUE 3.

[¶ 55] **Did the State use peremptory challenges in violation of due process guarantees by excluding prospective jurors with reservations about the death penalty?**

[¶ 56] It·is undisputed the State used peremptory challenges to eliminate prospective jurors who had some reservations about capital punishment. These individuals had indicated they could set aside their doubts and be fair and impartial and were therefore not excludable for cause under *Witherspoon* and its progeny. The State also waived its 19th and 20th peremptory challenges in an attempt to seat a jury before a prospective juror who had expressed equivocal sentiments about the death penalty could be called for individual questioning.

[¶ 57] Rhines contends the State's use of peremptory challenges violated his constitutional right to a trial by a fair and impartial jury. He argues the State should not be permitted to peremptorily challenge all jurors with mere qualms about the death penalty when it is prohibited from excluding the same individuals for cause. He reasons that a jury which, because of the State's selective use of peremptory challenges, does not have any members with reservations about capital punishment is no different than a jury from which members of that group have been excluded for cause. Rhines thus asserts his conviction and sentence must be reversed for a new trial by a jury that has not been culled of all who question the wisdom of the death penalty.

[¶ 58] By statute, the prosecution and the defense are each given an equal number of peremptory challenges. SDCL 23A–20–20. A peremptory challenge "is an objection to a juror for which no reason need be given." SDCL 23A–20–19. It can be exercised "'without inquiry and without being subject to the court's control.'" *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, ——, 114 S.Ct. 1419, 1431, 128 L.Ed.2d 89, 108 (1994) (O'Connor, J., concurring) (quoting *Swain v. Alabama*, 380 U.S. 202, 220, 85 S.Ct. 824, 836, 13 L.Ed.2d 759, 772 (1965)). An exception is upon a prima facie showing that the prosecutor used peremptory challenges in a racially or sexually discriminatory manner. *Batson v. Kentucky*, 476 U.S. 79, 96–7, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69, 87–88 (1986); *J.E.B.*, 511 U.S. at ——, 114 S.Ct. at 1429, 128 L.Ed.2d at 106–07. The prosecutor then has the burden of establishing nondiscriminatory reasons for striking particular members of the venire. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88; *J.E.B.*, 511 U.S. at ——, 114 S.Ct. at 1429, 128 L.Ed.2d at 106–07. This restriction on the State's use of peremptory challenges is based on the principle that a person's race or gender is unrelated to his fitness as a juror. *See Batson*, 476 U.S. at 87, 106 S.Ct. at 1718, 90 L.Ed.2d at 81; *J.E.B.*, 511 U.S. at ——, 114 S.Ct. at 1426–27, 128 L.Ed.2d at 102–04. However, "[t]here is no basis for declaring

that a juror's attitudes towards the death penalty are similarly irrelevant to the outcome of a capital sentencing proceeding." *Brown v. North Carolina,* 479 U.S. 940, 941, 107 S.Ct. 423, 424, 93 L.Ed.2d 373, 374 (1986) (O'Connor, J., concurring). In fact, "a juror's views on capital punishment, unlike his or her race, are directly related to potential performance on a capital jury." *State v. Fullwood,* 323 N.C. 371, 373 S.E.2d 518, 525 (1988), *vacated on other grounds,* 494 U.S. 1022, 110 S.Ct. 1464, 108 L.Ed.2d 602 (1990). Ignoring these attitudes would severely inhibit the State's prosecution of capital crimes and defense counsel's zealous representation of their clients.

> There can be no dispute that a prosecutor has the right, indeed the duty, to use all legal and ethical means to obtain a conviction, including the right to remove peremptorily jurors whom he believes may not be willing to impose lawful punishment. Of course, defense counsel has the same right and duty to remove jurors he believes may be prosecution oriented. This Court's precedents do not suggest that the *Witherspoon* line of cases restricts the traditional rights of prosecutors and defense counsel to exercise their peremptory challenges in this manner.

*Gray,* 481 U.S. at 671–72, 107 S.Ct. at 2058, 95 L.Ed.2d at 641–42 (Powell, J., concurring).

[¶ 59] United States Supreme Court precedent teaches that " 'jury competence is an individual rather than a group or class matter.' " *J.E.B.,* 511 U.S. at ——, 114 S.Ct. at 1434, 128 L.Ed.2d at 112 (Kennedy, J., concurring) (quoting *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181, 1185 (1946)). The discriminatory use of peremptories based on race or gender gives effect to an invidious group stereotype and preempts an individualized assessment of competency. That is not the case where a juror is peremptorily challenged due to his or her own views of the death penalty. In that case, counsel has made a particularized and fact-based appraisal of the prospective juror's ability to judge fairly and impartially. Pernicious group biases have not been given effect in that circumstance.

[¶ 60] Rhines also ignores an important distinction between peremptory challenges and challenges for cause. Challenges for cause are unlimited, while peremptory challenges are restricted in number. In *Witherspoon,* state law permitted the prosecution to excuse for cause all jurors who expressed *any* conscientious scruples against capital punishment. 391 U.S. at 514, 88 S.Ct. at 1772–73, 20 L.Ed.2d at 780. This broad-based rule of exclusion gave the State a decided advantage in jury selection, because it was automatically guaranteed a jury free of any reservations about the death penalty.

[¶ 61] In contrast, peremptory challenges are limited and both the State and the defendant receive the same number. SDCL 23A–20–20. Consequently, the prosecution and the defense have an equal opportunity to remove those members of the venire who, while able to follow the instructions of the court, espouse extreme views of capital punishment. *See Brown,* 479 U.S. at 941, 107 S.Ct. at 424, 93 L.Ed.2d at 374 (O'Connor, J., concurring in denial of certiorari).

> "[W]e see no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. While a statute requiring exclusion of all jurors with any feeling against the death penalty produces a jury biased in favor of death, we have no proof that a similar bias arises, on either guilt or penalty issues, when *both parties* are allowed to exercise their equal, limited numbers of peremptory challenges . . . against jurors harboring specific attitudes they reasonably believe unfavorable."

*People v. Gordon,* 50 Cal.3d 1223, 270 Cal. Rptr. 451, 475, 792 P.2d 251, 275 (1990) (quoting *People v. Turner,* 37 Cal.3d 302, 208 Cal.Rptr. 196, 690 P.2d 669 (1984)) (emphasis in original), *cert. denied,* 499 U.S. 913, 111 S.Ct. 1123, 113 L.Ed.2d 231 (1991). *See also J.E.B.,* 511 U.S. at ——, 114 S.Ct. at 1431, 128 L.Ed.2d at 108 (O'Connor, J., concurring) ("Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of eliminat[ing] extremes of partiality on both sides, thereby assuring the selection

of a qualified and unbiased jury.") (quoting *Holland v. Illinois,* 493 U.S. 474, 484, 110 S.Ct. 803, 809, 107 L.Ed.2d 905 (1990)).

[¶ 62] Importantly, Rhines does not identify any jurors who were biased in favor of the State or otherwise incapable of fairly weighing the facts and applying the law. He simply objects to the elimination of jurors who may have been less inclined to impose a death sentence. "[A]n impartial jury consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'" *Lockhart v. McCree,* 476 U.S. 162, 178, 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137, 151 (1986) (quoting *Wainwright,* 469 U.S. at 423, 105 S.Ct. at 852, 83 L.Ed.2d at 841) (emphasis deleted). "[W]e do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor." *Wainwright,* 469 U.S. at 423, 105 S.Ct. at 852, 83 L.Ed.2d at 851. Furthermore, the law does not demand a balanced sampling of opinions in the jury box.

[I]f it were true that the Constitution required a certain mix of individual viewpoints on the jury, then trial judges would be required to undertake the Sisyphean task of "balancing" juries, making sure that each contains the proper number of Democrats and Republicans, young persons and old persons, white-collar executives and blue-collar laborers, and so on.

\* \* \*

... [I]t is simply not possible to define jury impartiality, for constitutional purposes, by reference to some hypothetical mix of individual viewpoints. Prospective jurors come from many different backgrounds, and have many different attitudes and predispositions. But the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

*Lockhart,* 476 U.S. at 183–84, 106 S.Ct. at 1770, 90 L.Ed.2d at 154–55.

[¶ 63] We therefore hold there is no state or federal constitutional prohi-bition against the State's use of peremptory challenges to exclude all prospective jurors who expressed reservations about the death penalty but were not excludable for cause on that basis.

## ISSUE 4.

[¶ 64] **Do South Dakota's capital punishment statutes violate the state or federal constitution?**

[¶ 65] Rhines contends that South Dakota's capital punishment statutes violate the state and federal constitutions on a number of grounds. In considering his claims, we reiterate that there is a strong presumption in favor of the constitutionality of a statute. *State v. Floody,* 481 N.W.2d 242, 255 (S.D.1992) (citing *Simpson v. Tobin,* 367 N.W.2d 757, 765 (S.D.1985)). This presumption is rebutted only when it appears clearly, palpably, and plainly that the statute violates a constitutional provision. *Id.*

### [¶ 66] 1. Distinctions between felony murder and premeditated murder.

[¶ 67] To satisfy constitutional requirements, a capital sentencing scheme "must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235, 249–50 (1983). Under South Dakota law, both felony murder and premeditated murder are punishable by death or by life imprisonment. SDCL 22–16–4; 22–16–12; 22–6–1.

[¶ 68] At the time of the killing of Schaeffer, South Dakota law defined felony murder as a homicide "committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throwing, placing or discharging of a destructive device or explosive." SDCL 22–16–4. Premeditated murder is defined as a homicide "perpetrated without authority of law and with a premedi-

tated design to effect the death of the person killed or of any other human being." *Id.*

[¶ 69] In order to impose a death sentence on an individual convicted of either felony murder or premeditated murder, the jury must find the existence of at least one statutory aggravating circumstance beyond a reasonable doubt. SDCL 23A–27A–4, –5. At the time of Rhines' crime, SDCL 23A–27A–1 listed the following aggravating circumstances:

(1) The offense was committed by a person with a prior record of conviction for a Class A or Class B felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions;

(2) The defendant by his act knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;

(3) The defendant committed the offense for himself or another, for the purpose of receiving money or any other thing of monetary value;

(4) The defendant committed the offense on a judicial officer, former judicial officer, prosecutor, or former prosecutor while such prosecutor, former prosecutor, judicial officer, or former judicial officer was engaged in the performance of his official duties or where a major part of the motivation for the offense came from the official actions of such judicial officer, former judicial officer, prosecutor, or former prosecutor;

(5) The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person;

(6) The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim;

(7) The offense was committed against a law enforcement officer, employee of a corrections institution, or fireman while engaged in the performance of his official duties;

(8) The offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement;

(9) The offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another; or

(10) The offense was committed in the course of manufacturing, distributing, or dispensing substances listed in Schedules I and II in violation of § 22–42–2.

1989 S.D. Sess.L. ch. 206.

[¶ 70] Rhines argues that individuals who commit felony murder are less culpable than those who are guilty of premeditated murder, presumably because they lack the specific intent to kill another human being. He claims the law therefore fails to distinguish between those individuals who deserve the death penalty and those who do not.

[¶ 71] We reject Rhines' claim for three reasons. First, we note Rhines was convicted of premeditated murder, not felony murder. Therefore, any constitutional inequities in the punishment of felony murderers are inapplicable to his case. Second, we cannot agree that individuals who commit murder while engaged in other serious crimes are less deserving of the death penalty than those who commit premeditated murder. Rhines implies that only those who intend to kill should qualify for the death penalty. While we agree that intent is a relevant consideration, we do not agree that only those who intend to kill should receive the ultimate punishment. The malicious motives elemental to felony murder can also justify a sentence of death. The law is free to equally condemn those who murder with the intent to kill and those who also murder, but do so with the intent to rape, steal, or burn.

[¶ 72] Third, in claiming that felony murder is less deserving of capital punishment, Rhines ignores the long list of statutory aggravating circumstances that further

limit the imposition of the death sentence. Unless the jury finds at least one of these aggravating circumstances, indicating more extreme criminal culpability, an individual guilty of felony murder cannot receive the death sentence. We therefore conclude the State's capital sentencing scheme "reasonably justif[ies] the imposition of a more severe sentence on [certain] defendant[s] compared to others found guilty of murder." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742, 77 L.Ed.2d at 249–50. Rhines' constitutional challenge is rejected.

### [¶ 73] 2. Defining and narrowing "death eligible" offenses.

[¶ 74] Without identifying any other specific infirmities, Rhines separately alleges that the legislature's broad delineation of Class A felonies, combined with the statutory aggravating circumstances in SDCL 23A–27A–1, does not sufficiently narrow and define the pool of "death eligible" offenses. He further argues that the trial court may not cure these constitutional defects by fashioning jury instructions to define and limit capital crimes. He asserts that to do so would violate the separation of powers between the legislative and judicial branches and represent an unconstitutional delegation of legislative authority.

[¶ 75] Rhines makes the generalized complaint that the pool of death eligible offenses is too broad. He does not articulate any specific reasons why these classifications are inadequate. We note the United States Supreme Court has approved a state capital punishment scheme that is nearly identical to South Dakota's death penalty laws. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Rhines' general allegations defy more meaningful review and therefore fail.

[¶ 76] As to Rhines' claim that state courts are prohibited from fashioning limiting instructions, we must disagree. The United States Supreme Court has held that the existence of vague and overbroad definitions of capital crimes does not necessarily establish a constitutional violation. *Walton v. Arizona,* 497 U.S. 639, 653–54, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511, 528–29 (1990).

The Court expressly acknowledged that a state court may further define and limit otherwise vague and overbroad aggravating factors so as to provide guidance to the sentencer and satisfy constitutional requirements. 497 U.S. at 654, 110 S.Ct. at 3057, 111 L.Ed.2d at 529.

### [¶ 77] 3. Guidance concerning mitigating evidence.

[¶ 78] When the jury returns a guilty verdict in a capital case, the trial court must conduct a presentence hearing before the jury. SDCL 23A–27A–2. At that time, the jury may hear additional evidence in mitigation and aggravation of punishment. *Id.* Under South Dakota's capital sentencing statutes, the jury must find the existence of an aggravating circumstance beyond a reasonable doubt before it may impose the death penalty. SDCL 23A–27A–4 and –5. The law permits the jury to consider any mitigating circumstances, but does not impose any standard of proof regarding mitigation. SDCL 23A–27A–1 and –2.

[¶ 79] Rhines asserts that death sentences will be arbitrarily imposed in violation of the state and federal constitutions, because the South Dakota capital sentencing statutes do not include a standard of proof for mitigating circumstances or otherwise explain how the jury should weigh evidence of mitigation.

[¶ 80] In determining whether an individual eligible for the death penalty should in fact receive that sentence, the law demands that the jury make "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California,* 512 U.S. ——, ——, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750, 760 (1994) (citations omitted) (emphasis in original). "The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Blystone v. Pennsylvania,* 494 U.S. 299, 307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255, 264 (1990). Capital sentencing procedures that permit the jury to exercise wide discretion in evaluating mitigating and aggravating facts are consistent with an individualized sentencing

determination. *Tuilaepa,* 512 U.S. at ——, 114 S.Ct. at 2636, 129 L.Ed.2d at 761. South Dakota's open-ended treatment of mitigating evidence coincides with the mandate of individualized sentencing.

[¶ 81] Our state's capital sentencing scheme is modeled after Georgia's sentencing procedures. In *Gregg,* a plurality of the United States Supreme Court gave tacit approval to the Georgia scheme:

> While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence[.]

*Gregg,* 428 U.S. at 206–07, 96 S.Ct. at 2941, 49 L.Ed.2d at 893 (plurality opinion of Stewart, Powell, and Stevens, J.J.). *See also Zant,* 462 U.S. at 875, 103 S.Ct. at 2741–42, 77 L.Ed.2d at 248–49 (noting the *Gregg* Court approved Georgia's capital sentencing statute even though it did not enunciate specific standards to guide the jury's consideration of aggravating and mitigating circumstances).

[¶ 82] Similarly, the Court has opined: "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.... '[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed' is not impermissible in the capital sentencing process." *Tuilaepa,* 512 U.S. at ——, 114 S.Ct. at 2638–39, 129 L.Ed.2d at 764 (quoting *McCleskey v. Kemp,* 481 U.S. 279, 315 n. 37, 107 S.Ct. 1756, 1779 n. 37, 95 L.Ed.2d 262, 293 n. 37 (1987)). The Court has stated its position in even more emphatic terms:

> We have rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Franklin v. Lynaugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155, 169 (1988). Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or

mitigation, to be considered by the sentencer.

*Harris v. Alabama,* 513 U.S. ——, ——, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004, 1014 (1995). Based on this authority, we conclude that South Dakota's statutes adequately direct the jury's evaluation of aggravating and mitigating evidence during the capital sentencing phase.

### [¶ 83] 4. The jury as sentencer.

[¶ 84] SDCL 23A–27A–4 states that upon receipt of a jury recommendation of death, the trial judge "*shall* sentence the defendant to death." (Emphasis supplied.) Rhines contends this mandatory provision prevents the trial judge from ruling on the appropriateness of the jury's verdict, as he may in other cases, and therefore violates equal protection guarantees. He asserts the trial court cannot consider whether the sentence was imposed arbitrarily, whether the evidence supported the jury's finding of an aggravating circumstance, and whether the sentence was excessive or disproportionate to the penalty imposed in similar cases. He further argues the mandatory nature of the jury's verdict denies the capital defendant the opportunity to request a judgment of acquittal or file a motion for a new trial.

[¶ 85] Neither the state nor federal constitution require the trial court to review the propriety of the jury's sentencing decision in a capital case. The United States Supreme Court has approved a capital sentencing scheme that permits the jury, rather than the trial court, to make the sentencing decision. *Gregg,* 428 U.S. at 206–07, 96 S.Ct. at 2940–41, 49 L.Ed.2d at 893 (plurality opinion of Stewart, Powell, and Stevens, J.J.); *Gregg,* 428 U.S. at 221–24, 96 S.Ct. at 2947–49, 49 L.Ed.2d at 901–04 (concurring opinion of White, Rehnquist, J.J., and Burger, C.J.). In approving this scheme, the Court did not mandate that the trial judge independently review the jury's sentencing decision. Additionally, in *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), the Court seemed to acknowledge the jury's legitimate role as sentencer in a capital case: "This Court's decisions indicate that the discretion of the sentencing authority, *whether judge or jury,* must be limited and reviewa-

ble." 468 U.S. at 462, 104 S.Ct. at 3163, 82 L.Ed.2d at 354 (emphasis added). The Court further wrote:

> We have no particular quarrel with the proposition that juries, perhaps, are more capable of making the life-or-death decision in a capital case than of choosing among the various sentencing options available in a noncapital case. Sentencing by the trial judge certainly is not required by *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). What we do not accept is that, *because juries may sentence,* they constitutionally must do so. (Emphasis supplied.)

468 U.S. at 463 n. 8, 104 S.Ct. at 3163–64 n. 8, 82 L.Ed.2d at 354 n. 8.

[¶ 86] In addition, unlike any other criminal defendants, individuals who are sentenced to death by a jury or a trial judge receive automatic appellate review of their sentence. SDCL 23A–27A–9 ("If the death penalty is imposed, and if the judgment becomes final in the trial court, the sentence *shall* be reviewed on the record by the South Dakota Supreme Court.") (Emphasis supplied.) In evaluating the sentence, this Court must determine:

(1) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A–27A–1; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

SDCL 23A–27A–12.

[¶ 87] In light of this Court's sweeping, mandatory review of a capital defendant's sentence, we find no constitutional error in vesting the sentencing decision solely in the jury rather than the trial court.

### ISSUE 5.

[¶ 88] **Did the trial court abuse its discretion in admitting statements by Rhines concerning inequities in the justice system?**

[¶ 89] Over Rhines' objection, the trial court admitted the following portion of his June 19, 1992, taped confession for the jury's consideration during the guilt phase of the trial:

Allender: You don't really buy into our justice system do you? I mean you don't really believe in it?

Rhines: Justice?

Allender: Yeah.

Rhines: For who? If I had $100,000 for a fancy attorney I'd walk. Free, on an acquittal.

Bahr: Do you think that's right, that, that?

Rhines: Do you?

Bahr: No, not if you took a life.

Rhines: You know it's true.

Bahr: Do you . . .

Rhines: If I had $100,000 to drop into the best attorney in the country or in the midwest region.

Bahr: But see anything's possible, Charles. But if somebody takes a life.

Rhines: I've seen guilty and then walk. Knowing they were guilty.

Bahr: Would you want to get off?

Rhines: Would you?

Bahr: I'm not in that predicament.

Rhines: Me neither.

Bahr: You've been completely honest with us, Charles?

Rhines: I'm not, I'm not in a predicament of wanting to get off and having the wherewithal to do so. I'm in the predicament of wanting to get off and not having the wherewithal to do so.

Bahr: Have you been truthful with us?

Rhines: As much as I can emotionally.

Bahr: These sequences as best your, that you can remember? I don't have anything further.

Allender: Either do I.

Rhines: Do you suppose uh try for a last Camel before the night?

Allender: Yeah.

Rhines: It's gonna be kind of rough (inaudible—talking over)

Allender: Um, just a second. This will be the end of this tape is 2232.

[¶ 90] The trial court found the discussion gave insight into the nature of Rhines' statements to law enforcement officers, showed his state of mind at the time of his confession, and allowed the jury to weigh Rhines' attitude about his confession and his crime. The court further found the probative value of this evidence outweighed any prejudicial effect.

[¶ 91] During the penalty phase of the trial, the State asked the court to instruct the jury to reconsider the evidence previously entered during the guilt proceedings. This would necessarily include Rhines' statements regarding the justice system. The defense did not raise any objections and the jury was instructed to reconsider all evidence previously admitted during the guilt phase.[3]

[¶ 92] Rhines argues his statements concerning the justice system were not relevant to either the guilt or sentencing proceedings. He disputes the trial court's finding that his remarks were relevant to his state of mind or the reliability of his confession. He asserts the statements were inadmissible character evidence, that portrayed him as a bad person who distrusted and scorned the criminal justice system. Rhines acknowledges that the effect of these statements on the jury's guilty verdict "may well have been minor or slight." However, he asserts the admission of his statements unfairly prejudiced him during the sentencing phase of the trial and warrant reversal of the jury's death sentence.

[¶ 93] According to the State, Rhines' remarks reflect on the reliability and voluntariness of his statements, a relevant inquiry during the guilt phase of the trial. The State also asserts the sentencer must have a broad range of information so that it may appropriately determine the sentence, and evidence of Rhines' background and character, particularly his lack of remorse, was highly relevant to this determination. Even if the evidence

was not admissible, the State argues any error was harmless.

[¶ 94] "Evidence which is not relevant is not admissible." SDCL 19–12–2. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19–12–1. However, the trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" SDCL 19–12–3. This delicate balancing process is within the trial court's sound discretion and the court's ruling will not be disturbed absent abuse. *State v. Cross,* 390 N.W.2d 564, 566 (S.D.1986); *State v. Thomas,* 381 N.W.2d 232, 235 (S.D.1986).

### [¶ 95] 1. Admissibility at guilt phase.

[¶ 96] Contrary to Rhines' contention, the trial court properly determined his statements were relevant to the determination of guilt. The remarks in question tend to show the truthfulness of Rhines' confession. Rhines compared himself to other individuals who are guilty of murder. He referred to "wanting to get off." He also stated that he was as truthful as he could be with the officers. All of these statements reinforce State's assertion that Rhines killed Schaeffer and that his confession to the crime was freely and knowingly given.

[¶ 97] Nor can we conclude that admission of the remarks unduly prejudiced Rhines during the guilt phase. Prejudice "refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Holland,* 346 N.W.2d 302, 309 (S.D.1984). The statements in question were brief and occurred at the end of Rhines' lengthy and detailed confession. In this context, the jury was more likely to rely on the statements for their legitimate purpose—as proof of the reliability

---

3. Under SDCL 23A–27A–12, this Court must determine "whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Because of this independent basis for reviewing the proceedings in a capital sentencing hearing, we need not decide whether the failure to renew evidentiary objections during the penalty phase constitutes a waiver or triggers plain error analysis. *See State v. Sonnier,* 379 So.2d 1336, 1370 (La.1980).

of Rhines' confession, rather than as evidence of bad character.

[¶ 98] Even if the statements were improperly admitted, it would constitute harmless error. Evidence of Rhines' guilt was overwhelming. Rhines confessed to the burglary and murder four times, once to a young woman and three times to law enforcement officers. The jury even listened to tape recordings of Rhines confessing to the burglary and the murder. His statements about the location of clothing and other items that he discarded after the crime were substantiated by witnesses who discovered the items. The defense did not refute any of the State's evidence, having rested immediately after the conclusion of the State's case. In light of the strong evidence of Rhines' guilt, it is unlikely the jury would unfairly rely on Rhines' disputed statements in rendering a guilty verdict.

[¶ 99] **2. Admissibility at penalty phase.**

[¶ 100] In all capital cases where the jury has rendered a guilty verdict, state law requires a hearing prior to sentencing. SDCL 23A–27A–2. "Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment." *Id.* In this case, the trial court granted a defense motion prohibiting the State from offering any evidence on non-statutory aggravating factors. The State was therefore restricted to offering evidence that related to the aggravating circumstances set forth in SDCL 23A–27A–1.

[¶ 101] Rhines contends the disputed statements were irrelevant to any of the aggravating circumstances urged by the State. We disagree. One aggravating factor alleged by the State was that Rhines committed the murder to avoid being arrested for burglary. SDCL 23A–27A–1(9). In the disputed discussion, Rhines indicated he wanted "to get off" and that only his lack of money prevented him from doing so. His desire to avoid punishment in spite of his admitted wrongdoing directly relates to his alleged motive for killing Schaeffer—to avoid lawful arrest and confinement. The possibility that the jury might disapprove of Rhines' cynical attitude is not enough to defeat the probative value of this evidence. Furthermore, even if

the evidence was irrelevant or unfairly prejudicial, any error was harmless. There was ample evidence relating to the circumstances of the murder. As noted above, Rhines confessed four times, once to a young woman and three times to law enforcement officers, and the jury listened to recordings of two of Rhines' confessions. Armed with Rhines' own account of his crime, it is unlikely the jury relied on the disputed remarks in ascertaining the circumstances of Schaeffer's death and rendering its sentence.

## ISSUE 6.

[¶ 102] **Did the trial court abuse its discretion in refusing to appoint a forensic communication expert to assist Rhines in preparing his case?**

[¶ 103] Rhines submitted a pretrial motion for appointment of a forensic communication expert to conduct and analyze a community attitude study and design a supplemental juror questionnaire at the county's expense. Rhines was concerned that his homosexuality would unfairly influence the jury, and he anticipated using the community attitude survey and juror questionnaire to address this issue. The trial court denied Rhines' motion.

[¶ 104] Rhines claims the denial of the motion was an abuse of the trial court's discretion. He contends voir dire alone was an inadequate method for detecting and eliminating jurors with biases against homosexuality. To support his claim, he points to portions of a three-page note composed by the jury and delivered to the court during penalty deliberations. The note included the following questions:

Will Mr. Rhines be allowed to mix with the general inmate population?

Will Mr. Rhines be allowed to discuss, describe or brag about his crime to other inmates, especially new and or young men jailed for lesser crimes (Ex: drugs, DWI, assault, etc.)?

Will Mr. Rhines be allowed to marry or have conjugal visits?

Will Mr. Rhines be jailed alone or will he have a cell mate?

The trial court responded to the jury's questions with the following written statement: "I acknowledge your note asking questions about life imprisonment. All the information I can give you is set forth in the jury instructions."

[¶ 105] Rhines contends the jury's note reflected homophobic sentiments that improperly affected jury deliberations. He asks this Court to reverse his conviction and sentence and order that he receive the requested expert assistance on retrial.

 [¶ 106] The appointment of an expert is within the trial court's discretion. *State v. Stuck*, 434 N.W.2d 43, 50 (S.D.1988) (citing *State v. Archambeau*, 333 N.W.2d 807, 811 (S.D.1983)). "Trial courts should scrutinize a defense request for an expert to insure that an indigent defendant may procure any reasonable defense, and, when in doubt, lean toward the appointment of such an expert." *Id.* at 51 (citing *State v. Hallman*, 391 N.W.2d 191, 195 (S.D.1986)). Where an indigent defendant such as Rhines requests appointment of an expert at county expense, four requirements must be satisfied: (1) the request must be in good faith; (2) it must be reasonable in all respects; (3) it must be timely and specifically set forth the necessity of the expert; and (4) it must specify that the defendant is financially unable to obtain the required service himself and that such services would otherwise be justifiably obtained were defendant financially able. *Id.* (Citations omitted.)

 [¶ 107] In this case, there was no necessity for a public opinion survey and supplemental questionnaire to ascertain juror bias. "[V]oir dire examination is the better forum for ascertaining the existence of hostility towards the accused." *State v. Smith*, 477 N.W.2d 27, 33 (S.D.1991) (citing *State v. Reutter*, 374 N.W.2d 617, 629 (S.D.1985)). Our review of voir dire shows an impartial jury was impaneled. Defense counsel questioned eleven of the twelve jurors regarding their feelings about homosexuality. Ten of the jurors expressed neutral feelings about homosexuality, indicating it would have no impact on their decision making. The eleventh juror stated that she regards homosexuality as sinful. However, she also stated Rhines' sexual orientation would not affect how she decided the case. Rhines' counsel did not seek to remove this juror from the panel.

 [¶ 108] Although Rhines contends the jury's note to the judge shows a bias against homosexuality, we do not agree. The jury's questions during the penalty phase relate to prison conditions rather than Rhines' sexual orientation. The jurors began the note with the following statement:

Judge Konnekamp [sic],

In order to award the proper punishment we need a clear prospective [sic] of what "Life In Prison Without Parole" really means. We know what the Death Penalty Means, but we have no clue as to the reality of Life Without Parole.

Other questions posed by the jury involved whether Rhines would be given work release, placed in a minimum security prison, allowed to create a group of followers or admirers, permitted to attend college, or allowed to "have or attain any of the common joys of life (ex TV, Radio, Music, Telephone or hobbies and other activities allowing him distraction from his punishment)." The jury also asked what the daily routine would be in prison. The jury closed with these remarks:

We are sorry, Your Honor, if any of these questions are inappropriate but there seems to be a huge gulf between our two alternatives. On one hand there is Death and on the other hand what is Life in prison w/out parole.

In this context, the jury's questions about Rhines marrying, having a cell mate or conjugal visits, and having contact or discussions with other inmates do not reflect a bias against Rhines' sexual preference. Instead, they reflect the jury's legitimate efforts to weigh the appropriateness of life imprisonment versus the death penalty. We find no abuse of discretion by the trial court.

### ISSUE 7.

[¶ 109] **Did the trial court abuse its discretion by refusing three of Rhines' proposed jury instructions?**

[¶ 110] The trial court refused Rhines' proposed jury instructions Nos. 8, 9 and 11.

Rhines claims the trial court's failure to give these instructions violated the due process and cruel punishment clauses of the United States and South Dakota Constitutions.

[¶ 111] The trial court has broad discretion in instructing the jury. *State v. Bartlett*, 411 N.W.2d 411, 415 (S.D.1987). "[J]ury instructions are adequate when, considered as a whole, they give the full and correct statement of the law applicable to the case." *State v. Fast Horse*, 490 N.W.2d 496, 499 (S.D.1992) (citing *State v. Grey Owl*, 295 N.W.2d 748, 751 (S.D.1980)) (emphasis omitted). To warrant reversal, the trial court's refusal to give an appropriate instruction must unfairly prejudice the defendant. The defendant must show that " 'the jury might and probably would have returned a different verdict if [the] instruction had been given.' " *Bartlett*, 411 N.W.2d at 415 (quoting *Grey Owl*, 295 N.W.2d at 751, *appeal after remand*, 316 N.W.2d 801 (S.D.1982)).

[¶ 112] We will consider each of Rhines' proposed jury instructions separately.

### [¶ 113] 1. Proposed jury instruction No. 8: sufficiently substantial aggravating circumstances.

[¶ 114] Rhines' proposed jury instruction No. 8 stated in relevant part:

South Dakota law allows the imposition of the death penalty only if the prosecution, in addition to proving that the defendant is guilty of murder in the first degree, also proves each of the following beyond a reasonable doubt:

(1) That one or more of the alleged aggravating circumstances exist; and

(2) That the aggravating circumstance or circumstances, considered in connection with any mitigating circumstances, are sufficiently substantial to require the death penalty in this case, and that death is the only appropriate punishment for the crime committed, and for the defendant.

[¶ 115] Rhines contends the proposed instruction was necessary to suitably limit and guide the jury's sentencing discretion. We disagree. Rhines' proposed instruction would require that aggravating circumstances be "sufficiently substantial." Neither the state nor federal constitutions impose this requirement. Once the sentencer finds the existence of a statutory aggravating circumstance, it has broad discretion to decide whether to impose the sentence of death. Further, the "sufficiently substantial" standard does little to aid the jury in its difficult sentencing decision. The trial court instructed the jury that the death penalty could not be imposed unless at least one aggravating circumstance was present beyond a reasonable doubt. The trial court further instructed that the jury could impose a penalty of life imprisonment even if it found the existence of one or more statutory aggravating circumstances, explaining that a life sentence could be imposed for any or no reason. These instructions were sufficient to guide the jury's discretion.

### [¶ 116] 2. Rhines' proposed jury instruction No. 9: presumption of life imprisonment.

[¶ 117] Rhines' proposed instruction No. 9 stated in pertinent part:

The law also presumes that the appropriate sentence for murder in the first degree is life in prison without parole. This presumption is sufficient to justify your recommendation that the appropriate sentence in this case is life in prison without parole. Only if the jury is unanimously convinced beyond a reasonable doubt both that one or more aggravating circumstances exist, and that the death penalty is the only appropriate sentence in this case, may the jury return a verdict recommending a sentence of death.

[¶ 118] According to Rhines, his death sentence violates the due process and cruel punishment clauses of the state and federal constitutions, because the jury was not instructed regarding the presumption in favor of life imprisonment over the death penalty.

[¶ 119] The trial court's instructions adequately advised the jury of the State's burden of proof and the presumption of innocence in favor of the defendant. The court instructed the jury:

In this case the law raises no presumption against the Defendant; but every presumption of the law is in favor of his innocence

as to the alleged aggravating circumstances. He is not required to prove himself innocent of the aggravating circumstances, or put in any evidence at all upon that subject. The fact that the Defendant has not testified in this case raises no presumption· against him, and you must give no thought to the fact that the Defendant did not testify in his own behalf in this case in arriving at your sentencing decision.

Furthermore, the law gives the jury broad discretion to impose life imprisonment rather than a sentence of death, and the trial court properly instructed the jury in this regard. As noted above, the trial court informed the jury they could impose a life sentence regardless of whether they found any aggravating circumstances that might otherwise authorize the imposition of the death penalty. The trial court further advised the jury that they need not find the existence of any mitigating facts or circumstances in order to fix the penalty at life imprisonment. Finally, the court charged the jury that they may fix the penalty at life imprisonment for any reason or without any reason. These instructions, taken together, amply informed the jury of their authority to set the penalty at life imprisonment. There was no abuse of discretion in refusing Rhines' proposed instruction.

### [¶ 120] 3. Rhines' proposed jury instruction No. 11: effect of life or death sentences.

[¶ 121] Rhines' proposed jury instruction No. 11 stated:

The two specified sentences that you are to consider in this case are death, and life in prison without parole.

In your deliberations, you are to presume that if you sentence Charles Russell Rhines to death, he will in fact be executed by lethal injection. You must not assume or speculate that the courts, or any other agency of government, will stop the defendant's execution from taking place.

Similarly, you are to presume that if you sentence Charles Russell Rhines to life in prison without parole, he will in fact spend the rest of his natural life in prison. You must not assume or speculate that the courts, or any other agency of government, will release the defendant from prison at any time during his life.

[¶ 122] The note sent by the jury to the trial judge asked whether Rhines could ever be placed in a minimum security prison or given work release. According to Rhines, this demonstrates that the trial court's instructions were inadequate, and that the jury was unduly concerned that Rhines would be released if he received a life sentence. He claims he was unfairly prejudiced by the trial court's refusal to read the instruction.

[¶ 123] We believe the trial court's instruction adequately advised the jury regarding the effect of either a life or death sentence. The trial court informed the jury:

The decision you make will determine the sentence which will be imposed by the court. If you decide on a sentence of death, the court will impose a sentence of death. If you decide on a sentence of life imprisonment without parole, the court will impose a sentence of life imprisonment without parole.

[¶ 124] The trial court's instruction gave a "full and correct statement of the law." There was no error in refusing Rhines' proposed instruction.

### ISSUE 8.

[¶ 125] **Did the trial court err in allowing victim impact testimony during the penalty phase of the trial?**

[¶ 126] SDCL 23A–27A–1 sets forth the aggravating circumstances which may be considered by a judge or jury when determining whether to impose the sentence of death. Effective July 1, 1992, nearly four months after the murder of Donnivan Schaeffer, the legislature amended SDCL 23A–27A–1 to permit "testimony regarding the impact of the crime on the victim's family."[4] 1992 S.D.Sess.L. ch. 173, § 2.

---

4. This provision has since been deleted from SDCL 23A–27A–1 and inserted in SDCL 23A–27A–2.

[¶ 127] During a pretrial motion hearing, the State gave oral notice of intent to offer victim impact testimony at the penalty phase of the proceedings. Rhines filed a motion to exclude any such testimony. Following a hearing, the trial court ruled that victim impact testimony would be allowed during the penalty proceedings based on the case of *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The Court indicated that such evidence could be offered "in response to Defendant's mitigating evidence."

[¶ 128] Peggy Schaeffer, Donnivan Schaeffer's mother, read the following statement during State's rebuttal at the penalty hearing:

Donnivan was our youngest son. He was a happy, considerate and helpful young man. His dreams were to finish school, live on his own, and get married. He attended Vo–Tech and had a job waiting for him when he graduated. His plan was to marry Sheila Pond in May, 1993. Our dreams were becoming his dreams and those dreams are never to be a reality. Not having Donnivan with us has left us with heartache and sadness that at times seem unbearable. Now, at the end of the hall in our home is a bedroom filled with memories and we can only dream of the future Donnivan may have had.

[¶ 129] Rhines contends the trial court committed reversible error by allowing the introduction of Peggy Schaeffer's victim impact testimony. He makes numerous arguments in support of his position. First, Rhines asserts the *Payne* decision simply authorizes states to pass laws that allow the sentencer to consider some types of victim impact evidence. He argues that at the time of Rhines' alleged offense, South Dakota statutes and case law did not authorize admission of victim impact testimony, so the evidence was inadmissible. Second, Rhines notes the South Dakota Legislature did amend SDCL 23A–27A–1 to explicitly allow victim impact testimony, but only did so after Schaeffer's murder and the Court's decision in *Payne*. Rhines contends the amendment is a substantive rather than a procedural law. Because this statutory provision was not in effect at the time of Rhines' alleged offense, he argues the admission of victim impact testimony violated the constitutional prohibition against *ex post facto* laws. *See* U.S.Const. Art. I, § 10; S.D.Const. Art. VI, § 12. Third, Rhines objects to the characterization of the victim impact statement as a rebuttal to evidence offered by Rhines during the penalty phase. During the sentencing proceedings, Rhines offered the testimony of his two sisters. He claims their testimony was limited to his upbringing and their relationship with him; they did not testify to Donnivan Schaeffer's character or the impact of his death on his family. Fourth, even if otherwise admissible, Rhines claims Peggy Schaeffer's testimony went beyond the bounds of victim impact testimony, because at least half of the statement described Schaeffer's personal characteristics rather than the impact of his death. Finally, Rhines asserts the improper admission of Peggy Schaeffer's testimony was not harmless error, because the jury likely would have imposed a less severe sentence without this evidence.

[¶ 130] We hold that the trial court did not abuse its discretion in admitting the victim impact testimony. In *Payne*, 501 U.S. at 817, 111 S.Ct. at 2604, 115 L.Ed.2d at 730, the Court reconsidered whether "the Eighth Amendment prohibits a capital sentencing jury from considering 'victim impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." The Court had previously held that such evidence was *per se* inadmissible in the penalty phase of a capital trial. *Payne*, 501 U.S. at 811, 111 S.Ct. at 2601, 115 L.Ed.2d at 726 (citing *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989); *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)).

[¶ 131] The Court began by noting that the impact of a defendant's crime is a relevant sentencing consideration:

[T]he assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in deter-

mining the elements of the offense and in determining the appropriate punishment. *Payne*, 501 U.S. at 819, 111 S.Ct. at 2605, 115 L.Ed.2d at 731. The Court further observed that "the sentencing authority has always been free to consider a wide range of relevant material." 501 U.S. at 820–21, 111 S.Ct. at 2606, 115 L.Ed.2d at 732. As to the propriety of admitting victim impact testimony in a capital sentencing proceeding, the Court reasoned:

> Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.... We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family. By turning the victim into a faceless stranger at the penalty phase of a capital trial, *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735 (citations and quotations omitted). The Court therefore concluded "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

[¶ 132] *Payne* was decided in June, 1991, months before Rhines' murder of Schaeffer in March, 1992. Therefore, the rule in *Payne* does not implicate *ex post facto* analysis. However, Rhines contends that *Payne* requires a specific state statute autho-

rizing the admission of victim impact evidence. We can discern no such requirement in the Court's opinion. In fact, the Court seems to regard victim impact testimony as no different than other evidence for purposes of determining admissibility. The *Payne* Court wrote: "There is no reason to treat such evidence differently than other relevant evidence is treated." 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

[¶ 133] Under South Dakota law, evidence is generally admissible so long as it is relevant and is not unfairly prejudicial. SDCL 19–12–2, –3. We review the trial court's ruling on the admissibility of evidence under the abuse of discretion standard. *Thomas*, 381 N.W.2d at 235.

[¶ 134] The victim impact statement read by Schaeffer's mother related to her son's personal characteristics and the emotional impact of the crimes on the family. This is precisely the type of evidence permitted by the Court's decision in *Payne*, 501 U.S. at 817, 111 S.Ct. at 2604, 115 L.Ed.2d at 730. Rhines is therefore incorrect when he asserts that victim impact evidence may not include testimony about the victim's personal characteristics.

[¶ 135] Additionally, the information contained in the statement was relevant to the jury's sentencing decision. As noted by the *Payne* court, assessment of the harm caused by a criminal act is an important factor in determining the appropriate punishment. 501 U.S. at 819, 111 S.Ct. at 2605, 115 L.Ed.2d at 731. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

[¶ 136] Furthermore, the probative value of the victim impact statement was not substantially outweighed by the danger of unfair prejudice. *See* SDCL 19–12–3. The brief testimony by Schaeffer's mother came after Rhines' sisters testified about his upbringing and good qualities, their love for him, and the negative effect his death would

have on their family. To paraphrase *Payne*, the victim impact statement "illustrated quite poignantly some of the harm that [Rhines'] killing had caused; there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant." 501 U.S. at 826, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. We therefore hold that the trial court did not abuse its discretion in admitting the statement read by Schaeffer's mother.

## ISSUE 9.

[¶ 137] **Did the trial court err in its instructions to the jury regarding the definition of "depravity of mind" for purposes of imposing the penalty of death?**

 [¶ 138] The Eighth and Fourteenth Amendments to the United States Constitution prohibit state sentencing systems that cause the death penalty to be wantonly and freakishly imposed. *Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606, 618 (1990).

> [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates standardless sentencing discretion. It must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.

*Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398, 406 (1980) (Stewart, J., plurality opinion) (citations and quotations omitted).

 [¶ 139] "A State's definitions of its aggravating circumstances—those circumstances that make a criminal defendant 'eligible' for the death penalty—therefore play a significant role in channeling the sentencer's

discretion." *Lewis*, 497 U.S. at 774, 110 S.Ct. at 3099, 111 L.Ed.2d at 619. To satisfy constitutional mandates, an aggravating circumstance must meet two basic requirements. First, it "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742, 77 L.Ed.2d at 249–50. Second, "the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa*, 512 U.S. at ——, 114 S.Ct. at 2635, 129 L.Ed.2d at 759. A challenged provision is impermissibly vague when it fails to adequately inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with open-ended discretion. *Maynard v. Cartwright*, 486 U.S. 356, 361–62, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372, 380 (1988).

[¶ 140] As noted above, under the South Dakota sentencing statutes, the jury may not recommend a sentence of death unless it finds at least one aggravating circumstance beyond a reasonable doubt. South Dakota includes the following aggravating circumstance in its statutory scheme:

> The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim[.]

SDCL 23A–27A–1(6).[5]

[¶ 141] The State alleged "the offense was outrageously or wantonly vile, horrible or inhuman in that it involved ... depravity of mind." SDCL 23A–27A1(6). In its sentencing instructions to the jury, the trial court defined depravity of mind as follows:

> Depravity of mind is a reflection of an utterly corrupt, perverted, or immoral state of mind *at the time of the murder*. In determining whether the offense of First Degree Murder in this case involved depravity of mind on the part of the Defendant, you may consider the age and physical characteristics of the victim and you may consider the actions of the defendant prior to, *during* and after the commission

---

5. In 1995, the legislature added the following sentence to SDCL 23A–27A–1(6): "Any murder is wantonly vile, horrible, and inhuman if the victim is less than thirteen years of age." 1995 S.D.Sess.L. ch. 132.

of the murder. In order to find that the offense of First Degree Murder involved depravity of mind, you must find that the Defendant, as a result of utter corruption, perversion, or immorality, committed torture upon the living victim; or subjected the body of the deceased victim to mutilation or serious disfigurement; *or relished the murder; or inflicted gratuitous violence upon the victim; or the senselessness of the crime; or the helplessness of the victim. If acts occurring after the death of the victim are relied upon by the state to show depravity of mind of the Defendant, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be drawn beyond a reasonable doubt that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim.* (Emphasis added.)

[¶ 142] Rhines submitted an alternative definition of depravity of mind that did not include the italicized language. The trial court rejected this instruction. Rhines contends the trial court's lengthier definition of depravity of mind was so vague and overbroad as to violate the "cruel and unusual punishment" clause of the Eighth Amendment and the due process guarantees of the Fourteenth Amendment to the United States Constitution.

[¶ 143] Rhines correctly notes there are essentially six separate definitions of depravity of mind in the trial court's instructions. They are that: (1) the defendant committed torture upon the living victim; (2) the defendant subjected the body of the deceased victim to mutilation or serious disfigurement; (3) the defendant relished the murder; (4) the defendant inflicted gratuitous violence upon the victim; (5) the senselessness of the crime; or (6) the helplessness of the victim. He specifically objects to the inclusion of the last two phrases, which ask the jury to consider the "senselessness of the crime" or the "helplessness of the victim" as distinct definitions of depravity of mind. Rhines argues virtually every murder satisfies these definitions. He reasons the jury's finding of depravity of mind was likely based on these

vague and overbroad phrases, since the other factors listed in the instruction did not apply. Rhines urges reversal of the death sentence for this reason.

[¶ 144] There is little doubt that the language of SDCL 23A–27A–1(6), by itself, is vague and overbroad. In *Godfrey*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398, the Court considered a provision identical to South Dakota's "outrageously or wantonly, vile, horrible or inhuman" circumstance. The trial court in *Godfrey* simply quoted the aggravating circumstance in its instructions to the jury and provided no additional definitions or explanations concerning this aggravating factor. 446 U.S. at 426, 100 S.Ct. at 1764, 64 L.Ed.2d at 405. The jury found beyond a reasonable doubt that the two murders committed by the defendant were "outrageously or wantonly vile, horrible and inhuman" and imposed the penalty of death. 446 U.S. at 426, 100 S.Ct. at 1764, 64 L.Ed.2d at 405. The Georgia Supreme Court affirmed the sentence, without applying any limiting construction to the aggravating circumstance. 446 U.S. at 432, 100 S.Ct. at 1767, 64 L.Ed.2d at 408–09. On appeal, the United States Supreme Court invalidated the death sentence. 446 U.S. at 433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409. Justice Stewart, writing for the plurality, condemned the trial court's bare reiteration of the statutory aggravating circumstance in its charge to the jury. 446 U.S. at 428–29, 100 S.Ct. at 1765, 64 L.Ed.2d at 406–07. He reasoned that the statutory provision, by itself, failed to give the jury adequate guidance in imposing the death penalty and therefore created the likelihood of an arbitrary and capricious result. 446 U.S. at 428–29, 100 S.Ct. at 1765, 64 L.Ed.2d at 406–07; *see also Espinosa v. Florida*, 505 U.S. 1079, 1080–82, 112 S.Ct. 2926, 2927–28, 120 L.Ed.2d 854, 858–59 (1992) (stating simple charge to jury that murder was "especially wicked, evil, atrocious or cruel" did not satisfy constitutional requirements); *Maynard*, 486 U.S. at 363–64, 108 S.Ct. at 1859, 100 L.Ed.2d at 382 (invalidating "especially heinous, atrocious, or cruel" aggravating factor where no additional limiting instruction was given).

[¶ 145] Finding the statutory language is vague and overbroad, as the *Godfrey* Court did, does not necessarily establish a constitutional violation. *Walton,* 497 U.S. at 653–54, 110 S.Ct. at 3057, 111 L.Ed.2d at 528. If a state court further defines and limits those otherwise vague and overbroad terms so as to provide adequate guidance to the sentencer, then constitutional requirements are satisfied. *Id.* In this case, we hold that the trial court's definition of depravity of mind does not meet these mandates.

[¶ 146] In *State v. Palmer,* 224 Neb. 282, 399 N.W.2d 706, 731–32 (1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987), the Nebraska Supreme Court approved a definition for "exceptional depravity" that is nearly identical to the "depravity of mind" definition given in this case. The *Palmer* court devised the following limiting instruction:

> [I]n determining whether the death penalty may be imposed, we hold that "exceptional depravity" in a murder exists when it is shown, beyond a reasonable doubt, that the following circumstances, either separately or collectively, exist in reference to a first degree murder: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim.

*Id.*

[¶ 147] In a subsequent appeal challenging the validity of the "exceptional depravity" circumstance, the Eighth Circuit Court of Appeals rejected the Nebraska Supreme Court's limiting instruction. *Moore v. Clarke,* 904 F.2d 1226, 1232–33 (8th Cir. 1990), *reh'g denied,* 951 F.2d 895 (8th Cir. 1991), *cert. denied, Clarke v. Moore,* 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992). The court reasoned that "senselessness of the crime" and "helplessness of the victim" were vague criteria that failed to adequately guide the sentencer's discretion. 904 F.2d at 1232. The court wrote:

> All murder victims could be characterized as "helpless" as evidenced by the fact that they were murdered.... "[H]elplessness" is too broad to be useful. Furthermore,

... "senselessness of the crime" has no objective meaning. If senselessness of the crime were sufficient to permit a death penalty, virtually all murderers would be on death row.

*Id.* at 1231–32.

[¶ 148] Arizona courts have similarly disapproved "senselessness of the crime" or "helplessness of the victim" as an independent measure of depraved conduct. *State v. Johnson,* 147 Ariz. 395, 710 P.2d 1050, 1056 (1985) (holding the senselessness of the killing in itself is not enough to satisfy the "especially heinous, or depraved" aggravating circumstance). *State v. Smith,* 146 Ariz. 491, 707 P.2d 289, 301 (1985) (ruling that absent additional aggravation, neither the senselessness of the crime nor the helplessness of the victim can alone make the offense especially heinous or depraved). *See also State v. White,* 395 A.2d 1082, 1090 (Del.1978) (holding the defenselessness of the victim is an unconstitutionally vague aggravating circumstance). We therefore hold that the depravity of mind circumstance, as limited by the trial court's instruction, did not adequately channel the sentencer's discretion as required by the state and federal constitutions. The effect of our holding is considered later in this opinion.

## ISSUE 10.

[¶ 149] **Did the trial court err in its instructions to the jury regarding SDCL 23A–27A–1(3), which permits the imposition of the death penalty if "the defendant committed the offense for himself or another, for the purpose of receiving money or any other thing of monetary value"?**

[¶ 150] The State alleged, as an aggravating circumstance, that Rhines committed the murder for himself for the purpose of receiving money. SDCL 23A–27A–1(3). The trial court instructed the jury in pertinent part:

> Before you may find that this aggravating circumstance exists in this case, you must find, beyond a reasonable doubt, that each of the following elements of this aggravating circumstance are proven by the evidence:

1. That the Defendant committed the murder for himself; and

2. That he committed the murder for the purpose of receiving money.

[¶ 151] Rhines had proposed a jury instruction which would have further defined the elements of this circumstance with the following language:

It is not sufficient if you merely conclude that the murder was committed during the course of the commission of a burglary, or that the murder was committed only to enable the defendant to retain possession of money already obtained.

The trial court refused this proposed instruction.

[¶ 152] In addition to the pecuniary gain circumstance, the State also alleged that the offense "was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." SDCL 23A–27A–1(9). Rhines does not dispute that he murdered Schaeffer to cover up Rhines' identity as the burglar and assailant so as to satisfy this aggravating circumstance. However, he contends the aggravating circumstance of "murder for the purpose of receiving money" should not apply, because (1) aggravating circumstances should not overlap so that the same facts can satisfy more than one circumstance; (2) the receipt of money was a result, rather than a cause, of Schaeffer's murder; (3) the murder was not part of a larger preexisting plan to obtain the money; and (4) Rhines had possession of the money before Schaeffer arrived, so the murder was not necessary to get the money.

[¶ 153] We reject Rhines' assertions of error. First, we do not agree that the sentencer is restricted to finding only one motive for capital murder. The jury may properly consider and find two conceptually distinct aggravating circumstances. Here, the State alleged that Rhines killed Schaeffer to silence a witness and to receive money— two separate motives for murder which could exist independent of one another.

[¶ 154] Second, we do not agree that the facts fail to satisfy the pecuniary gain circumstance for any of the reasons listed by

Rhines. Our review of the evidence demonstrates that Rhines did not have possession of all of the money when he killed Schaeffer and that obtaining this money was a motive for the murder. As an employee of Dig'Em Donuts, Schaeffer was responsible for collecting money from the West Main Street store and transporting it to the other Dig'Em Donut shops in the area. He was regarded as a trusted employee. It is reasonable to infer that Schaeffer would not have passively permitted Rhines to take the money without attempting to contact the police or otherwise stop the theft. By murdering Schaeffer, Rhines not only silenced a witness, he also facilitated receipt of the money. Additionally, although Rhines may not have intended to kill anyone when he entered the shop, the evidence suggests his intentions changed once he heard someone entering the store. Detective Allender testified that Rhines "was beginning to take the money" when he heard the door to the shop being opened. He retrieved his knife and waited behind the office door. Importantly, he did not wait until Schaeffer had seen or identified him. After explaining to the interrogating officers how he had stabbed and bound his victim, Rhines told them of his continued theft of the store:

Rhines: I went back in the office and finished getting, finished getting what money I could find. About $1,700. Actually about um, about, oh probably 16, 15–1600 out of there. Change fund, basically.

Allender: Yeah. And then

Rhines: Cleaned out the change fund on the wall. Went over, used the phone....

Based on the evidence at trial, we cannot conclude that Rhines had possession of all of the stolen money prior to the killing or that the theft was simply a result rather than a cause of Schaeffer's death.

## ISSUE 11.

[¶ 155] **Was the evidence insufficient to support the jury's finding that Rhines tortured Schaeffer?**

[¶ 156] The jury found that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved the torture of

Schaeffer. Rhines disputes this finding, arguing the evidence presented at trial was insufficient to show beyond a reasonable doubt that he tortured his victim. He notes the fact Schaeffer suffered pain or anticipated the prospect of death is not sufficient, because torture requires the intentional infliction of pain beyond that necessary to cause death. He claims the wounds inflicted on Schaeffer were designed to cause death, not unnecessary pain, and any suffering experienced by Schaeffer was incident to death.

■ [¶ 157] When reviewing the sufficiency of the evidence, we must consider the evidence in the light most favorable to the verdict. *State v. Buller*, 484 N.W.2d 883, 889 (S.D.1992) (citing *State v. Ashker*, 412 N.W.2d 97, 105 (S.D.1987)), *cert. denied*, 506 U.S. 887, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992). The jury's verdict will not be set aside if the evidence and all favorable inferences that can be drawn from it support a rational theory of guilt. *Id.* (citing *Ashker*, 412 N.W.2d at 105; *State v. Andrews*, 393 N.W.2d 76, 80 (S.D.1986)).

[¶ 158] According to Rhines' statements to police, he was burglarizing Dig'Em Donuts when Schaeffer unexpectedly entered the store. Schaeffer came into the office area of the store and Rhines stabbed him in the abdomen. Schaeffer fell down, thrashed about, and screamed Rhines' name. Rhines stabbed Schaeffer again in the back, piercing his left lung. Rhines then walked Schaeffer out of the office into the storeroom. Rhines could hear air whistling out of the wound in Schaeffer's back. As Rhines took Schaeffer to the storage area, Schaeffer said, "No, don't. I won't tell." Schaeffer also asked Rhines to call an ambulance for him. Rhines told Allender he thought, "Yeah, right, I am going to call you an ambulance, you bet." Rhines observed that Schaeffer became passive as though he realized he was going to die. Rhines seated Schaeffer on a pallet in the storeroom. He placed Schaeffer's head between his knees and thrust the knife into the base of his skull. Rhines claims Schaeffer continued to breathe and his arms were moving, so he tied Schaeffer's hands behind him. Rhines estimated that Schaeffer's

breathing continued for approximately two minutes after inflicting the final knife wound.

[¶ 159] A forensic pathologist, Dr. Donald Habbe, testified at the trial. He opined that the first stab wound would not have been fatal to Schaeffer, but would have caused pain and difficulty breathing. Dr. Habbe stated the second stab wound punctured the left lung and would have the same painful effects, with increased difficulty breathing. He also testified that air could possibly whistle through the back of the wound. According to Dr. Habbe, the combination of the first and second stab probably would not have been fatal. The final stab wound cut into Schaeffer's brain stem. Dr. Habbe opined that death would be "near instantaneous." He opined that Schaeffer may have shown some short involuntary movements in his hands and arms after the infliction of the last wound. He stated that he could not determine whether or not Schaeffer's hands were tied before or after the final stab wound to Schaeffer's neck. He did note that the rope around Schaeffer's wrists was tied very tightly, and that there were abrasions along Schaeffer's left and right wrists.

[¶ 160] Under the South Dakota capital sentencing statutes, the jury may not recommend a sentence of death unless it finds at least one aggravating circumstance beyond a reasonable doubt. One aggravating circumstance alleged by the State was that "the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture." SDCL 23A–27A–1(6). In its instructions to the jury, the trial court defined torture as follows:

> Torture occurs when a living person is subjected to the unnecessary and wanton infliction of severe physical or mental pain, agony, or anguish. Besides serious abuse, torture includes serious psychological abuse of a victim resulting in severe mental anguish to the victim in anticipation of serious physical harm. You would not be authorized to find that the offense of First Degree Murder involved torture simply because the victim suffered pain or briefly anticipated the prospect of death. Nor would acts committed upon the body of a deceased victim support a finding of tor-

ture. In order to find that the offense of First Degree Murder involved torture, you must find that the Defendant intentionally, unnecessarily, and wantonly inflicted severe physical or mental pain, agony or anguish upon a living victim.

[¶ 161] Rhines correctly observes that the trial court's instructions list two essential elements for a finding of torture: (1) the unnecessary and wanton infliction of severe pain, agony, or anguish; and (2) the intent to inflict such pain, agony or anguish. Our review of the evidence shows that both of these elements were satisfied. "Unnecessary pain" implies suffering in excess of what is required to accomplish the murder. *State v. Ramseur*, 106 N.J. 123, 524 A.2d 188, 229 (1987) (citing *State v. Sonnier*, 402 So.2d 650, 658–60 (La.1981), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983)). The defendant who intends to kill his victim instantly or painlessly does not satisfy this requirement, nor does the defendant who only intended to cause pain that is incident to death. *Ramseur*, 524 A.2d at 229–30.

[¶ 162] After Rhines inflicted the second non-fatal stab wound, he did not swiftly proceed to end Schaeffer's life. Instead, he brought Schaeffer to his feet and walked him to the storeroom. During this time, Schaeffer begged for his life and asked for medical help. Rhines ignored his pleas. He seated him on a pallet and arranged his body for what Rhines referred to as the *"coup de grace."* Rhines remarked that during this time Schaeffer became passive and seemed to acknowledge his impending death. We cannot agree that Schaeffer's mental and physical anguish during this time was simply pain incident to his death.

[¶ 163] Furthermore, one can reasonably infer from the evidence that Rhines bound Schaeffer's hands before he inflicted the third fatal stab wound. Rhines told interrogating officers that he tied Schaeffer's wrists because his breath was whistling out of the wound in his back. However, when the interrogating officers questioned Rhines about the possibility that Rhines bound Schaeffer before the fatal wound to his neck, Rhines' responses were evasive and nonsensical. Furthermore, Dr. Habbe testified that the whistling sound of Schaeffer's breath was consistent with Schaeffer's back wound, but that death after the third wound to the neck would have been "near instantaneous." Further, Dr. Habbe noted abrasions on Rhines' wrists, and the jury could reasonably infer that these marks were caused or exacerbated by Schaeffer's agonized struggle before his death.

[¶ 164] The evidence also shows that Rhines possessed the necessary intent for a finding of torture. When Schaeffer pleaded with Rhines for his life, Rhines did not tell officers of his desire to quickly end his victim's life. Instead, Rhines described his own sarcastic and scornful attitude toward Schaeffer's suffering. Rhines also stated that when he believed Schaeffer had survived the third stab wound, he tied his victim's hands and left him to die. This evidence supports a finding that Rhines intended to cause unnecessary pain to his victim.

### ISSUE 12.

[¶ 165] **Does the jury's consideration of an invalid aggravating circumstance require reversal of the death sentence?**

[¶ 166] In Rhines' case, the jury found four statutory aggravating circumstances. The jury determined: (1) the offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest under SDCL 23A–27A–1(9); (2) the offense was committed for the purpose of receiving money under SDCL 23A–27A–1(3); (3) the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture under SDCL 23A–27A–1(6); and (4) the offense was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind, also under SDCL 23A–27A–1(6). Rhines did not challenge the jury's finding that he committed the offense for the purpose of avoiding lawful arrest. Similarly, we have rejected Rhines' claims of error regarding the torture and pecuniary gain circumstances. However, we have concluded that the depravity of mind circumstance, as defined by the trial court, is constitutionally invalid.

[¶ 167] Rhines claims the invalidity of one of the aggravating circumstances found by

the jury requires reversal of his death sentence. Alternatively, he argues the Court may uphold the death sentence only if the jury still would have imposed the death sentence without the invalid factors. He alleges the jury's decision to impose the death penalty was a result of the multiple number of aggravating circumstances that were found. Because the invalid aggravating circumstance cannot be excised from the jury's sentence of death, he claims the sentence must be reversed.

[¶ 168] In *Zant,* the Court considered whether a defendant's death sentence must be vacated when one of the three statutory aggravating circumstances found by the jury was subsequently held to be invalid by the Georgia Supreme Court. 462 U.S. at 889, 103 S.Ct. at 2748, 77 L.Ed.2d at 257. The Court held that the invalidity of one aggravating circumstance did not require reversal of the death sentence. The Court stressed various factors that were important to its decision. First, the Court noted that the invalid aggravating circumstance did not implicate expressive activity that is protected by the First Amendment or include factors that are totally irrelevant to the sentencing process, such as the race, religion, or political affiliation of the defendant. 462 U.S. at 885, 103 S.Ct. at 2747, 77 L.Ed.2d at 255. Nor did the circumstance involve conduct that should militate in favor of a lesser penalty, such as the defendant's mental illness. 462 U.S. at 885, 103 S.Ct. at 2747, 77 L.Ed.2d at 255. Second, under Georgia law, aggravating circumstances simply identified those offenses that qualify as capital crimes, and the presence of only one circumstance was sufficient to permit consideration of the death penalty. 462 U.S. at 876–77, 103 S.Ct. at 2742, 77 L.Ed.2d at 249. Third, the same evidence relevant to the invalid circumstance was also admissible for purposes of ruling on the valid aggravating factors. 462 U.S. at 887–89, 103 S.Ct. at 2748–49, 77 L.Ed.2d at 256–57. Fourth, the Georgia death penalty statutes did not instruct the jury to weigh aggravating circumstances and mitigating circumstances against each other in deciding whether to impose a death sentence. 462 U.S. at 890, 103 S.Ct. at 2750, 77 L.Ed.2d at 258. Nor was the jury otherwise instructed to place any particular weight on the number of aggravating circumstances found. 462 U.S. at 891, 103 S.Ct. at 2750, 77 L.Ed.2d at 258. Finally, Georgia law mandated appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality. 462 U.S. at 890, 103 S.Ct. at 2749, 77 L.Ed.2d at 258.

[¶ 169] Importantly, as noted earlier, South Dakota's capital sentencing scheme is modeled after Georgia's death penalty statutes. All of the procedural safeguards emphasized in *Zant* are also present in our capital punishment law. First, the depravity of mind circumstance did not encompass conduct that is constitutionally protected, personal characteristics of the defendant that are totally irrelevant to the sentencing process, or conditions that should favor a lesser penalty. Second, aggravating circumstances serve only to narrow the class of offenders eligible for the death penalty, and the existence of only one such circumstance is sufficient to warrant consideration of capital punishment. Third, all of the evidence relevant to the "depravity of mind" circumstance was also properly admitted for purposes of deciding the existence of other valid aggravating factors. Fourth, our statutes do not require the jury to weigh aggravating circumstances against mitigating factors, and the jury was not instructed to consider the specific number of aggravating factors in deciding whether to render a death sentence. Finally, SDCL 23A–27A–12 mandates this Court to consider whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Therefore, in accordance with the Supreme Court's ruling in *Zant,* we hold the invalidity of the "depravity of mind" circumstance does not so taint the penalty proceedings as to mandate reversal of Rhines' death sentence.

## ISSUE 13.

[¶ 170] **Was Rhines' death sentence imposed under the influence of passion, prejudice, or other arbitrary factors?**

[¶ 171] Rhines contends the jury considered irrelevant or unfairly prejudicial matters when imposing the death penalty. He

claims the jury's note to the judge about life imprisonment demonstrates this bias. He specifically focuses on questions about whether prison conditions might allow "distraction from his punishment" and whether he might qualify for work release from prison.[6]

[¶ 172] Rhines also contends the trial court failed to adequately respond to the jury's improper concerns. As noted above, the trial court sent the following response to the jury:

> Dear Jurors: I acknowledge your note asking questions about life imprisonment. All the information I can give you is set forth in the jury instructions.

The trial court refused to give an additional instruction proposed by Rhines:

> You are further instructed, however, that you may not base your decision on speculation or guesswork.

Rhines contends that, by failing to give this instruction, the court improperly permitted the jury to speculate about the nature of life imprisonment.

### [¶ 173] 1. Passion, prejudice or other arbitrary factors.

[¶ 174] Once the jury has found the existence of an aggravating circumstance beyond a reasonable doubt, our capital sentencing scheme gives jurors broad discretion in deciding whether to impose life imprisonment or a death sentence. *See, e.g., Tuilaepa,* 512 U.S. at ——, 114 S.Ct. at 2636, 129 L.Ed.2d at 761. Indeed, prior to sentencing deliberations, the jury was appropriately instructed: "You may fix the penalty at life imprisonment, if you see fit to do so, for any reason satisfactory to you, or without any reason."

[¶ 175] In this context, the jury's questions about work release and "distraction from punishment" do not show that they considered irrelevant or arbitrary factors in rendering a verdict. Their questions directly relate to conditions of confinement under a sentence of life without parole. Prison life was an appropriate topic for discussion when weighing the alternatives of life imprisonment and the death penalty.

### [¶ 176] 2. Trial court's response.

[¶ 177] Rhines contends the trial court erred in failing to additionally advise the jury to avoid speculation and guesswork. We find no error. The decision whether to provide further instruction to the jury rests within the sound discretion of the trial court. *Floody,* 481 N.W.2d at 250 (citing *State v. Holtry,* 321 N.W.2d 530, 531 (S.D.1982)).

[¶ 178] Although other courts have responded to similar inquiries by instructing jurors to refrain from speculation, *People v. Hovey,* 44 Cal.3d 543, 244 Cal.Rptr. 121, 145–46, 749 P.2d 776, 800 (1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 188, 102 L.Ed.2d 157 (1988); *People v. Stankewitz,* 51 Cal.3d 72, 270 Cal.Rptr. 817, 842–43, 793 P.2d 23, 48–49 (1990), *cert. denied,* 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991), the trial court's decision to forego such an instruction was not an abuse of discretion. First, the proposed instruction to avoid speculation and guesswork could inadvertently chill the jury's broad discretion to fix the penalty at life imprisonment "for any reason . . . or without any reason." Second, the instructions given by the trial court fully and accurately advised the jurors of the law governing the case. We can discern no error in simply referring the jurors to these instructions. " 'If the court in the exercise of sound discretion concludes that information or further instructions are not required, it may properly refuse such a request.' " *Holtry,* 321 N.W.2d at 531 (quoting *State v. Weinandt,* 84 S.D. 322, 327, 171 N.W.2d 73, 77 (1969)).

### ISSUE 14.

[¶ 179] **Based on the appellate review mandated by SDCL 23A–27A–12, was Rhines' sentence of death lawfully imposed?**

[¶ 180] In every case where the death penalty is imposed, this Court is required to conduct an independent review of the sen-

---

6. Rhines also reiterates his claim that some of the jury's questions demonstrate a bias against homosexuality. Having previously addressed this allegation, we need not revisit it here.

tence. SDCL 23A–27A–12. We must determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A–27A–1; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

SDCL 23A–27A–12.

■■■ [¶ 181] We begin our review by determining whether the evidence supports any of the aggravating circumstances found by the jury. Rhines does not dispute that he committed the murder to avoid being arrested, thereby satisfying aggravating circumstance SDCL 23A–27A–1(9); there is substantial evidence in the record to support this finding. When describing the murder to Detective Allender and Deputy Sheriff Bahr, Rhines remarked, "leave no witnesses." He also referred to being "caught in the act." When discussing his decision to tie Schaeffer's hands, Rhines remarked, "I just don't want somebody to stand up in the middle of—or call anybody and go dial 911." Furthermore, we have previously concluded the offense was committed for the purpose of receiving money under SDCL 23A–27A–1(3) and the offense involved torture which was wantonly vile, horrible, or inhuman under SDCL 23A–27A–1(6). Clearly, Rhines was eligible for the death penalty.

■■■ [¶ 182] Nor can we conclude the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We have rejected Rhines' claims that inadmissible evidence was considered by the jury and that the jury permitted irrelevant facts to taint its verdict. We cannot discern any independent basis for invalidating the jury's sentence. Although Rhines presented mitigating evidence concerning his difficult youth and loving family, the decision to impose the death penalty in spite of this evidence was not arbitrary. Rhines brutally murdered Donnivan Schaeffer so he could steal less than $2,000 in cash and escape responsibility for his crime. The law permits mercy, but does not require it.

[¶ 183] Finally, we consider whether Rhines' death sentence is excessive or disproportionate to the penalty imposed in similar South Dakota cases. SDCL 23A–27A–12(3) is patterned after the proportionality review provisions in the Georgia capital punishment statutes. As the United States Supreme Court observed in *Gregg*, provision for proportionality review:

substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

428 U.S. at 206, 96 S.Ct. at 2940, 49 L.Ed.2d at 893.

[¶ 184] As for the mechanics of proportionality review, Rhines argues the pool of similar cases for proportionality review should encompass all homicide cases that were prosecuted or could have been prosecuted under the State's current capital punishment scheme. He reasons that prosecutorial discretion is an important factor that this Court must consider when ruling on proportionality. The State argues the pool of similar cases should be limited to those South Dakota cases proceeding to the capital punishment phase, regardless of whether a death sentence was actually imposed. There are seven other South Dakota cases that have proceeded to death penalty deliberations.

■■■ [¶ 185] We conclude that similar cases for purposes of SDCL 23A–27A–12(3) are those cases in which a capital sentencing proceeding was actually conducted, whether the sentence imposed was life or death. "[B]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar ... are those in which imposition of the death penalty was properly be-

fore the sentencing authority for determination." *Tichnell v. State*, 297 Md. 432, 468 A.2d 1, 15–16 (1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). *Accord, Flamer v. State*, 490 A.2d 104, 139 (Del.1983), *cert. denied*, 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985).

[¶ 186] Since the enactment of South Dakota's current death penalty statute in 1979, eight capital sentencing proceedings have taken place. In six of those cases, the jury imposed life sentences. In Rhines' case and one other, the jury returned a verdict of death. We will briefly set forth the facts of each of these other cases so as to provide a foundation for our review.

[¶ 187] *State v. Adams*

[¶ 188] Howard Adams and Jimmy Lee Boykin kidnapped, robbed and murdered DuWayne Jensen, a stranger who was delivering newspapers early in the morning on June 19, 1986. Jensen's jaw and windpipe had been fractured and both of his eyes were blackened. The cause of his death was multiple stab wounds. The State sought the death penalty, alleging the offense was committed for the purpose of receiving money or any other thing of monetary value and the offense was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim. The jury only found the aggravated battery circumstance and sentenced Adams to life imprisonment. Mitigating circumstances included Adams' deprived childhood, a history of alcohol abuse, and use of alcohol immediately prior to the crime.

[¶ 189] *State v. Bittner*

[¶ 190] On March 20, 1982, two police officers responded to a complaint that Steven Bittner had physically abused his girl friend in the home the couple shared. As the officers proceeded to the upstairs portion of the house, Bittner bounded down the stairs and stabbed both officers. One of the officers died as a result of his injuries.

[¶ 191] The State sought the death penalty, alleging one aggravating circumstance— that the offense was committed against a law enforcement officer while in the performance of his duties. The jury sentenced Bittner to life imprisonment, without finding the existence of any statutory aggravating circumstances. Bittner established various mitigating circumstances, including abuse and neglect as a child, a history of alcohol or drug abuse, use of alcohol immediately prior to the crime, and a disavowal of any intent to deliberately kill the officer.

[¶ 192] *State v. Helmer*

[¶ 193] The State alleged that William J. Helmer killed an acquaintance, Randy Dixon, by shooting Dixon in the head. The State also claimed that, after killing Dixon, Helmer cut off Dixon's head and hands with an axe. Helmer presented evidence that he had experienced mental problems for a number of years. Testimony indicated that Helmer suffered from post-traumatic stress disorder at the time of Dixon's murder. There was also evidence indicating Dixon had been abusive toward Helmer and may have stolen property from Helmer.

[¶ 194] The State sought the death penalty, asserting the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim and the offense was committed for the purpose of receiving money or anything of monetary value. The jury convicted Helmer of first-degree murder and sentenced Helmer to life imprisonment.

[¶ 195] *State v. Moeller*

[¶ 196] The State alleged Moeller anally and vaginally raped a nine-year-old girl and stabbed her to death. The State sought the death penalty, claiming the offense was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim. The jury convicted Moeller of rape and first-degree murder. The jury also found the existence of the aggravated battery circumstance and imposed a sentence of death.

[¶ 197] *State v. Smith*

[¶ 198] During the course of a bank robbery, James Elmer Smith shot a woman who failed to follow his order to lie down on the floor. The woman died within a few minutes of receiving the gunshot wound. The State sought the death penalty, alleging three ag-

gravating circumstances: (1) the defendant knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person; (2) the offense was committed for the purpose of receiving money or any other type of monetary value; and (3) the offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement. The jury convicted Smith of first-degree murder and returned a verdict of life imprisonment.

[¶ 199] *State v. Swallow*

[¶ 200] Accompanied by two others, Edwin Swallow went to the home of Conrad Wilson, an illicit drug dealer. A shootout ensued. Wilson was found, barely alive, on the porch of the house. He eventually died of his injuries. Wilson's seventeen-year-old daughter, who was not involved in the drug trade, was found dead from a single shotgun blast.

[¶ 201] The State sought the death penalty against Swallow, alleging the murder of Wilson's daughter was committed by a person who had a substantial history of serious assaultive criminal convictions and was committed for the purpose of receiving money or any other thing of monetary value. Mitigating evidence showed Swallow was twenty-two years old, had a history of drug abuse, and that a co-perpetrator had received a sentence of sixty-five years. There was also testimony indicating Wilson initiated the shootout by firing at Swallow's companions.

[¶ 202] The jury convicted Swallow of one count of first-degree manslaughter for the death of Wilson and one count of first-degree murder for the death of Wilson's daughter. The judge imposed a life sentence for the manslaughter conviction. The jury imposed a life sentence without possibility of parole for the first-degree murder conviction, without indicating whether the aggravating circumstances were satisfied.

[¶ 203] *State v. Waff*

[¶ 204] David Waff killed Russell Keller in exchange for a payment of $1500 from Keller's business partner. Waff had shot Keller once in the head and stabbed him eight times. The State sought the death penalty, asserting the murder was committed for the purpose of receiving money or other things of monetary value and the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. The jury found Waff guilty of first-degree murder and sentenced him to life imprisonment.

[¶ 205] The law demands individualized sentencing. *Tuilaepa,* 512 U.S. at ——, 114 S.Ct. at 2635, 129 L.Ed.2d at 760. The jury's verdict in any capital case is necessarily premised on the unique facts before it. Yet, all defendants facing the death penalty are entitled to fairness and reasonable consistency in its imposition. *State v. Bey,* 137 N.J. 334, 645 A.2d 685, 689 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1131, 130 L.Ed.2d 1093 (1995). " '[A] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction.' " *Id.* (quoting *State v. Marshall,* 130 N.J. 109, 613 A.2d 1059, 1070 (1992)).

[¶ 206] A dissenting opinion implies that Rhines' sentence is disproportionate because he is one of only two defendants to have received a verdict of death. We respectfully suggest this reasoning is flawed. First, the fact that Rhines is among the first to receive a death sentence does not signify that his sentence is disproportionate. Otherwise, the death penalty itself would be nullified. Second, a death sentence should not be invalidated simply because a jury determined that another defendant, who committed an analogous crime, deserved mercy. Proportionality review focuses not only on the crime, but also on the defendant. SDCL 23A–27A–12(3). *See State v. Benn,* 120 Wash.2d 631, 845 P.2d 289, 317 (1993) (quoting *State v. Lord,* 117 Wash.2d 829, 822 P.2d 177, 223 (1991)) ("Simply comparing numbers of victims or other aggravating factors may superficially make two cases appear similar, where in fact there are mitigating circumstances in one case to explain either a jury's verdict not to impose the death penalty or a prosecutor's decision not to seek it."),

*cert. denied,* —— U.S. ——, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993).

[¶ 207] We conclude the death sentence is not excessive or disproportionate in Rhines' case. First, we note Rhines' offense involved the existence of three separate aggravating circumstances. Only one other case, *State v. Smith,* 477 N.W.2d 27 (S.D. 1991), alleged the presence of three aggravating factors. Marked distinctions between Rhines' case and *Smith* justify the juries' different verdicts. In *Smith,* the victim died quickly from a single gunshot delivered swiftly and unexpectedly by Smith. In contrast, Schaeffer did not die quickly from a single wound. Rhines first stabbed him in the stomach, which caused Schaeffer to collapse to the floor, screaming and writhing in pain. After Rhines pierced Schaeffer's lung with the second thrust of his knife, Schaeffer pleaded for his life. According to Rhines, when he assisted Schaeffer to the storeroom to deliver the *"coup de grace,"* Schaeffer seemed to anticipate his own death. The disparity in suffering endured by victims is an important and legitimate consideration when evaluating the proportionality of a death sentence.

[¶ 208] Additionally, the nature of the evidence in this case sets it apart from any other capital case in this state. In the seven other cases where the death penalty was considered, the prosecution's evidence was circumstantial or involved testimony by third-persons who observed the defendant's wrongdoing or who heard inculpatory statements by the defendant. In this case, the jury heard Rhines' own description of his crime. His arrogant and cold-blooded attitude toward his offense was made shockingly apparent in his own words and in his own voice. Rhines described the stabbing of Schaeffer in chilling, clinical detail. He told about Schaeffer "thrashing" and "screaming" after the first stab wound. He said air whistled out of the wound in Schaeffer's back, and called it a "sucking back wound." As to the final death blow, Rhines remarked: "Sat him down and put him basically, his head between his legs and applied the knife to the back of the neck where the skull joins the spinal column. Right in the joint at the spinal column. In kind of upward, up and in.... Attempted to reach the small brain ..." Then Rhines told the officers, "... he was still breathing, I didn't know what I had. I've never stabbed anybody to death. I've never stabbed anybody, period. You guys seen anybody get stabbed to death? Know what it takes? Quit fighting very quickly, but, you don't die very quickly." When the officers told Rhines that a pathologist had suggested Schaeffer might have been tied up before the last stab wound, Rhines stated, "Too bad he wasn't there. To watch." Then Rhines burst into laughter. In explaining Schaeffer's movements after the last wound, Rhines drew an analogy to butchered chickens. Rhines laughed intermittently throughout the first interview, usually in reference to witnesses the officers had not spoken to or items of evidence they had not found. At one point he remarked caustically, "I try not to condescend." During Rhines' lengthy taped confessions, he did not spontaneously express any feeling of remorse for Schaeffer's death. When finally asked, "Are you sorry Donnivan's dead now?" Rhines simply responded, "Yeah." He then proceeded to tell the officers that he wanted to "get off."

[¶ 209] Faced with such compelling evidence of the defendant's moral culpability and apparent lack of sincere remorse, we conclude the death sentence imposed on Rhines was neither excessive nor disproportionate to the penalty imposed in similar cases in South Dakota.

[¶ 210] Affirmed.

[¶ 211] GILBERTSON, J., and JOHNSON, Circuit Judge, concur.

[¶ 212] SABERS and AMUNDSON, JJ., dissent.

[¶ 213] JOHNSON, Circuit Judge, sitting for KONENKAMP, J., disqualified.

SABERS, Justice (dissenting).

[¶ 214] The issue is: Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

[¶ 215] For the reasons stated herein, the sentence of death is excessive and dispropor-

tionate to the penalty imposed in similar cases, considering both the crime and the defendant. SDCL 23A–27A–12(3).

[¶ 216] SDCL 23A–27A–12 provides the factors to be reviewed by the Supreme Court regarding a death sentence. For the purpose of this case, I will assume that this death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, and that the evidence supports the jury's finding of a statutory aggravating circumstance as enumerated in SDCL 23A–27A–1.

[¶ 217] However, as indicated above, SDCL 23A–27A–12(3) mandates that the Supreme Court affirmatively determine that this death sentence is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant. In fact, unless we affirmatively determine that the death sentence is neither excessive nor disproportionate to the penalties imposed in criminal cases, then, in that event, SDCL 23A–27A–14 requires that "the court shall sentence such person to life imprisonment." That is what must be done here.

[¶ 218] Before considering the penalties imposed in similar cases, it is very important to point out that in *Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 879, 79 L.Ed.2d 29, 40–41 (1984), the United States Supreme Court held that the Constitution of the United States does not require proportionality review. In other words, it was not necessary for the South Dakota Legislature to enact SDCL 23A–27A–12(3) requiring mandatory proportionality review by the South Dakota Supreme Court. I submit that it was a mistake for the South Dakota Legislature to require mandatory proportionality review when it was not required by the United States Constitution. This statement presumes, of course, that the death penalty was desired by the legislature in most murder cases.

[¶ 219] Most murders are, for the most part, full of aggravating circumstances and at least for death penalty proponents, more than adequate for capital punishment. However, when our legislature has clearly said that those aggravating circumstances are *not*

*enough,* and that, in addition, there must be mandatory proportionality review by the Supreme Court, it is clear that no death sentence shall be imposed unless we can affirmatively determine that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. In other words, even if we were to conclude that this defendant and this defendant's crime deserves death, we cannot impose it because it is excessive and disproportionate to the penalties imposed in similar cases. That is our task under SDCL 23A–27A–12(3). It did not have to be that way, but it is. The United States Constitution does not require it but the South Dakota Legislature does.

[¶ 220] Concerning the mechanics of proportionality review, the majority opinion states:

> Rhines argues the pool of similar cases for proportionality review should encompass all homicide cases that were prosecuted or could have been prosecuted under the State's current capital punishment scheme. He reasons that prosecutorial discretion is an important factor that this Court must consider when ruling on proportionality. The State argues the pool of similar cases should be limited to those South Dakota cases proceeding to the capital punishment phase, regardless of whether a death sentence was actually imposed. There are seven other South Dakota cases that have proceeded to death penalty deliberations.

The majority opinion promptly proceeds to adopt the State's argument without any consideration of other murder cases and without any reasoned analysis.

[¶ 221] It seems clear to me that if proportionality review is to be meaningful, as intended by our legislature, the pool of "similar cases" must include at a minimum *all* reported murder cases. This would present no great difficulty in South Dakota, where the crime of murder is still infrequent, if not uncommon. Generally, we have less than ten reported murder cases per year. Prosecutorial discretion and plea bargaining should be factors for consideration, even if not controlling, and the cases disposed of by those

methods should not be *automatically* omitted.[7] At any rate, to limit the pool of "similar cases" to the seven as the majority does is, in itself, arbitrary and unreasonable.

[¶ 222] It takes no great memory to recall numerous "similar cases" where the facts and the aggravating circumstances were at least as hideous as in Rhines' case. In fact, the major distinguishing feature in all other cases is that the penalty was life in prison or less, and not death. Consider for a moment, the following cases:

1. *State v. Ashker*, 412 N.W.2d 97 (S.D. 1987).

 Lewis Ashker and Curt Novaock were convicted of first-degree murder of the death of Jerry Plihal in Delmont. Plihal had struggled with his attackers and had been stabbed numerous times. Plihal's guns were missing, but not found by the authorities.

2. *Jenner v. Leapley*, 521 N.W.2d 422 (S.D.1994).

 In 1986, Jackie Sjong was found dead under a bridge near Spearfish, the victim of four bullets fired at close range, from two different weapons. Sjong was "picked up" by Michael Jenner in California and brought to Sturgis for execution because he had "ratted" on a fellow club member. Michael Jenner and Richard Elliott, members of an "outlaw" motorcycle club, were convicted of first-degree murder and each received a life sentence.

3. *State v. Braddock*, 452 N.W.2d 785 (S.D.1990).

 Edward Braddock was convicted of murder and sentenced to life imprisonment for killing Douglas Cramer by shooting him 8 times with an AK-47 assault rifle at the Edgemont city dump. He claimed Cramer owed him money.

4. *State v. Rough Surface*, 440 N.W.2d 746 (S.D.1989).

Donald Rough Surface received life in prison for murder, rape, robbery and assault of his uncle. The victim's body was found naked, bloody, badly beaten, and burned in the crawl space beneath a grain elevator in Mobridge. The victim had also been raped and robbed.

5. *State v. Bradley*, 431 N.W.2d 317 (S.D. 1988).

 Jamie Thunder Hawk's body was found in a roadside ditch near Baltic in 1986. Her head had been severed with a knife. There was testimony that she had been abused and tortured over a period of time by Bradley and that on the day of her death, she was kicked, raped and strangled to death. Bradley received life imprisonment.

6. *State v. Miller*, 429 N.W.2d 26 (S.D. 1988).

 Todd Miller was convicted of murder, kidnapping, possession of ransom money and forgery for the death of his "friend" Michael Kinney near Aberdeen. He received life sentences.

7. *State v. Corder*, 460 N.W.2d 733 (S.D. 1990).

 Ronald Corder and Harvey Ernst each received a life sentence for the brutal beating of Clifford Hirocke near Vermillion.

8. *State v. Davi*, 504 N.W.2d 844 (S.D. 1993).

 Scott Davi received life in prison for convictions of murder and rape of his ex-wife, and burglary of her apartment in Sioux Falls. She had been brutally beaten, raped and strangled.

9. *State v. Phillips*, 489 N.W.2d 613 (S.D. 1992).

 Darlene Phillips received a life sentence in her conviction of conspiracy to commit murder. After several aborted attempts with poison and fire to kill her ex-husband for whom she was caring,

---

7. Consider for a moment the recent "murder for hire" case of Mary K. Ross in Sioux Falls. The man who hired the killing and the two killers received life sentences as a result of pleas despite the fact that she was stabbed numerous times over a substantial period of time. She lived long enough to call the 911 operator to report that she

was being killed and that her baby was in the next bedroom.

Several years ago, a young man brutally raped and murdered a nine-year-old Sioux Falls Argus Leader paper girl and received a life sentence.

Under the majority's view, these cases would *never* be considered in its pool of similar cases.

she and others smothered him with a pillow in Lemmon.

10. *State v. Henjum,* 1996 SD 7, 542 N.W.2d 760 (S.D.1996).

Finally, as recently as February 27, 1994, in Mitchell, Lawrence Henjum, shot his friend and roommate, Mark Nelson, in the head with a rifle for no apparent reason. The murder charge was dropped to manslaughter, he pled guilty and received forty-five years.

[¶ 223] Minimal research discloses approximately 80 reported murder cases since 1978, many of which are as hideous as Rhines' case. *None* of them resulted in a death sentence. *None* of them are even considered in the majority opinion.

[¶ 224] Even if the pool of similar cases was limited to the seven cases used by the majority, the facts and aggravating circumstances of *Rhines* are more common than exceptional. Although the specific details vary, the brutality of each killing is similar. In fact, viewed objectively, all of them were hot or cold blooded murders or executions against defenseless victims. The only real distinguishing feature is that all of those murderers received life in prison. Therefore, Rhines' death sentence is disproportionate *and* excessive in comparison.

[¶ 225] As stated in the majority opinion: "[A] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction." *State v. Marshall,* 130 N.J. 109, 613 A.2d 1059, 1070 (1992). To paraphrase, Rhines' death sentence is comparatively excessive *because all* other defendants with similar characteristics received sentences other than death for committing factually similar offenses in the same jurisdiction.

[¶ 226] Accordingly, it is pure fiction to say that Rhines' death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. Therefore, we have no choice but to reverse and remand because, in these circumstances, the law requires that "the court shall sentence such person to life imprisonment." SDCL 23A-27A-14.

AMUNDSON, Justice (dissenting).

[¶ 227] I respectfully dissent on Issue 14, for I believe the majority's comparative proportionality review universe or pool is too restrictive. When I embarked on this mandated review, I felt much like Benjamin N. Cardozo when he stated:

I was much troubled in spirit in my first years upon the bench, to find how trackless was the ocean on which I had embarked. I sought for certainty. I was oppressed and disheartened when I found that the quest for it was futile.... As the years have gone by, and as I have reflected more and more upon the nature of the judicial process, I have become reconciled to the uncertainty, because I have grown to see it as inevitable. I have grown to see that the process in its highest reaches is not discovery, but creation; and that the doubts and misgivings, the hopes and fears, are part of the travail of mind, the pangs of death and the pangs of birth, in which principles that have served their day expire, and new principles are born.

Benjamin N. Cardozo, *The Nature of the Judicial Process,* 166 (1921).

[¶ 228] One of the fundamentals of proportionality review is to avoid "death sentences imposed ... wantonly or freakishly." *Gregg v. Georgia,* 428 U.S. 153, 224, 96 S.Ct. 2909, 2948, 49 L.Ed.2d 859, 903 (1976) (White, J., concurring). In order to avoid such a result, a larger pool needs to be used for comparison to ensure we properly perform this ominous task. This maiden voyage provides an opportunity to establish a procedure for evaluating the appropriateness of a death sentence. A court should not lose sight of the fact that the purpose of this review is fairness notwithstanding the nature of the crime.

[¶ 229] In *State v. Mercer,* 618 S.W.2d 1, 21 (Mo.1981) (Seiler, J., dissenting) it was noted:

By "similar cases" is meant similar capital murders, not limited only to those where both death and life imprisonment were submitted to the jury and then affirmed on appeal, whichever way the case went on punishment. The evil deed is the

murder and what accompanied it and that, as well as the defendant, is what must be looked at in comparing what one defendant received in punishment under a capital murder charge with what another received. The fact that a capital murder defendant does not get the death penalty or gets a new trial or that the state waived the death penalty in his case or that his case is still pending before us does not mean that we can ignore his case in making our comparison. Once we accept the idea, as we must, that the death penalty cannot be inflicted at random, or arbitrarily or inconsistently, then necessarily we must take into consideration all capital murders we know about.

[¶ 230] Our state legislature mandates us to carry out proportionality review. SDCL 23A–27A–12. Since 1979, SDCL 23A–27A–8 has required this court to accumulate the records of all capital felony cases that we deem appropriate. The information available at this time tracks cases from 1981 until 1993. Our records contain forty-eight capital felony cases that we deemed appropriate to accumulate. Beyond the records assembled in Pierre at this time, there are at least four other cases that could be included in this accumulation.[8] What is the majority's rationale for culling this established pool to seven? Since the legislature has mandated this review, it must be meaningful or the result will be suspect. As Justice Utter stated in his dissent in *State v. Benn*, 120 Wash.2d 631, 845 P.2d 289, 326–27 (1993):

> Without such review, the death penalty, like lightning, will strike some, but not others, in a way that defies rational explanation. The severity of the death penalty, its irrevocability, and our statutory mandate, require us to assess carefully whether the death penalty has been imposed arbitrarily. We cannot, under the statute, simply defer to a jury's sentencing determination.

[¶ 231] SDCL 23A–27A–12(3) states that we are to consider both the crime and the defendant when conducting our comparative review, not just that a capital proceeding took place. In South Dakota, only two people since 1979 have been sentenced to death out of at least fifty-two eligible criminals. In conducting comparative proportionality review, if we required a case to be on all fours with the other cases in order for them to be similar, I submit that would be impossible. By using the pool already assembled by this court, it gives notice to the parties involved in the litigation as to what cases will be considered. Then, the litigants can make their argument on this issue based on that pool. Otherwise, a defendant does not find out what are similar cases until the decision is handed down. There is no statute in South Dakota that defines "similar case" nor does any statute provide us with a standard for performing the mandated review. On the other hand, all of the cases which I recommend be included in the pool have one similarity, namely, a wrongful taking of another person's life. By employing such a pool, this court would be proceeding with appropriate care and caution when making a decision involving life or death of a human being.

[¶ 232] In conclusion, I might personally feel Rhines has earned the sentence imposed by the jury, but that is not the issue. The issue is whether the death penalty is being imposed uniformly and not arbitrarily. This issue cannot be resolved by only considering cases where capital sentencing proceedings were actually conducted.

---

8. *State v. Helmer,* 1996 SD 31, 545 N.W.2d 471 (Convicted July 8, 1994. Victim was shot and then decapitated and hands removed.); *State v. Henjum,* 1996 SD 7, 542 N.W.2d 760 (Pleaded guilty to manslaughter in the first degree sometime in 1994. Defendant shot victim with no provocation.); *State v. New,* 536 N.W.2d 714 (S.D.1995) (Convicted May 2, 1994, of second-degree murder. New stated he did not actually murder, just witnessed.); *State v. Larson,* 512 N.W.2d 732 (S.D.1994) (Convicted November 21, 1992, of second-degree murder. Victim shot while driving down Interstate.).